UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

REGENLAB USA LLC,

                    Plaintiff,

          -against-

ESTAR TECHNOLOGIES LTD., ECLIPSE
AESTHETICS LLC, and HEALEON
MEDICAL, INC.,

                    Defendants.

16-cv-08771 (ALC)

<u>OPINION AND ORDER</u>

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff RegenLab USA, LLC ("RegenLab") brings this action alleging patent infringement arising from the unauthorized use of its patentented technology. Before this Court are Defendant Estar Technologies Ltd. ("Estar")'s motion to dismiss for lack of personal jurisdiction and Defendant Eclipse MedCorp, LLC ("Eclipse")[1] and Healeon Medical, Inc. ("Healeon")'s motions to dismiss for improper venue. For the following reasons, the Court reserves decision on Estar's motion to dismiss pending a determination under the federal long arm statute; Eclipse's motion to dismiss for improper venue is DENIED; and Healeon's motion to dismiss for improper venue is GRANTED.

---

[1] Eclipse was formerly known as Eclipse Aesthetics, LLC.

# BACKGROUND

## I. Factual Background

The Court only recites those facts necessary to resolving the instant motions.

RegenLab, the United States affiliate of a Swiss manufacturer of medical and pharmaceutical products, brought suit for infringement of its "'957 patent" against Estar, an Israeli company and manufacturer of products that allegedly infringe the '957 patent, namely Mycells, Tropocells, "Eclipse PRP" and "Healeon PRP" ("the accused products")[2]; Eclipse, a Texas entity that distributes the accused products in the United States; and Healeon, a California entity affiliated with Eclipse. ECF No. 1 ("Compl.").

Pursuant to an exclusive distribution agreement, Eclipse serves as Estar's sole distributor of the accused products in the United States. *See* Declaration of Daniel J. Melman in Support of Estar's Motion to Dismiss ("Melman Jdx. Decl") Ex. B ("Distribution Agreement"). Estar imports the accused products to Eclipse's warehouse in Texas. Eclipse then distributes such products across the country, including in New York. *See* Compl. ¶ 44; Declaration of Stephen F.W. Ball, Jr. ("Ball Venue Decl") Ex. A, Declaration of Paul O'Brien ("O'Brien Decl"). Eclipse has sold the accused products in New York and made profits. *Id.* ¶ 4. Healeon also distributes Estar and/or Eclipse's products. Compl. ¶ 12.

## II. Procedural Background

RegenLab filed the complaint commencing this action on November 11, 2016. ECF No. 1. On March 16, 2017, Estar moved to dismiss for lack of personal jurisdiction. ECF Nos. 42-44 ("Estar Initial Mem"). That day, Eclipse and Healeon moved to dismiss for improper venue or, alternatively, to transfer this case to the Northern District of Texas. ECF Nos. 49 ("Eclipse

---

[2] Plaintiff alleges that the accused products are substantially equivalent to each other. Compl. ¶¶ 53-57; 68-70.

Initial Mem"); 50 ("Healeon Initial Mem").

Plaintiff subsequently sought jurisdictional and venue discovery. On August 17, 2017, this Court denied without prejudice the pending motions to dismiss and granted jurisdictional and venue discovery. ECF No. 102. The Court, however, limited discovery on personal jurisdiction to the questions of whether (1) Estar derived "substantial revenue from goods used or consumed" in New York under C.P.L.R. § 302(a)(3)(i) and (2) Estar expects or reasonably should expect that its sales would have consequences in New York under C.P.L.R. § 302(a)(3)(ii). *Id.* at 9-12.[3]

Following the completion of jurisdictional and venue discovery, Estar, Eclipse, and Healeon renewed their respective motions to dismiss. ECF Nos. 115 ("Healeon Mem"); 116 ("Estar Mem"); 117 ("Eclipse Mem"). Defendants filed their motions entirely under seal, without seeking leave from the Court. Plaintiff filed its opposition motions under seal on January 8, 2018. ECF Nos. 122 ("Pl Jdx. Mem"); 123 ("Pl Venue Mem"). Defendants filed their reply briefs under seal on January 19, 2018. ECF Nos. 125 ("Estar Reply"); 126 ("Eclipse Reply"). Healeon did not submit a reply brief. Defendants subsequently filed redacted versions of their memoranda of law in support of their motions to dismiss and reply briefs on ECF. ECF Nos. 134, 138, 145, 147, 148. Accordingly, the Court considers the motions fully submitted.

On February 23, 2018, Plaintiff filed a motion to unseal Defendants' memoranda of law in support of Defendants' motions to dismiss (ECF Nos. 134, 138 and 148); Plaintiff's memoranda of law in opposition to Defendants' motions to dismiss (ECF Nos. 120-21); and Defendants' reply memoranda of law (ECF Nos. 145, 147). ECF No. 151. Defendants

---

[3] The Court held that Plaintiff did not state a colorable claim under C.P.L.R. § 302(a)(3) that Estar (1) "regularly does or solicits business in New York: or (2) engaged in a "persistent course of conduct" in New York, and accordingly Plaintiff was not entitled to discovery on these claims. *Id.* at 9.

responded in opposition on March 2, 2018. ECF No. 154. On April 5, 2018, the Court granted

Plaintiff's motion to unseal and ordered Defendants to produce narrowly-tailored redactions.

ECF No. 155. Defendants submitted revised redactions on April 18, 2018.

## DISCUSSION

### I.  Personal Jurisdiction[4]

### A.  Legal Standard

In patent law cases such as this, "the existence of personal jurisdiction is, under Federal

Circuit law, determined in accordance with the law of the Court of Appeals for the Federal

Circuit." *JetBlue Airways Corp. v. Helferich Patent Licensing, LLC*, 960 F. Supp. 2d 383, 390

(E.D.N.Y. 2013) (citing *Hildebrand v. Steck Mfg. Co., Inc.*, 279 F.3d 1351, 1354 (Fed. Cir.

2002)). The Federal Circuit's test for personal jurisdiction "mirrors that of the one employed by

the Court of Appeals for the Second Circuit." *Id.* First, "we first apply the forum state's long-

arm statute." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (internal

quotation marks and citation omitted).[5] Second, "[i]f the long-arm statute permits personal

jurisdiction, we analyze whether personal jurisdiction comports with due process protections

established under the Constitution." *Id.* (citation omitted).

The plaintiff bears the burden of showing that jurisdiction is proper. However, the nature

of that burden shifts depending on the procedural posture of the litigation. "When the district

---

[4] In footnotes, Plaintiff alleges that Defendants waived their personal jurisdiction and venue arguments through litigation conduct. *See* Pl Jdx. Mem at 4 n.2; Pl Venue Mem at 4-5. The Federal Circuit applies its "own law, not that of the regional circuit, to issues of personal jurisdiction in a patent infringement case," including the issue of waiver. *Rates Tech. Inc. v. Nortel Networks Corp.*, 399 F.3d 1302, 1307 (Fed. Cir. 2005) (citation omitted). The Federal Circuit "places waiver . . . within the discretion of the trial court, consistent with the trial court's broad authority to manage actions pending before it." *Id.* (citations omitted). Plaintiff has not provided any caselaw to show that Defendants' conduct is sufficient to constitute waiver. All motions were timely filed. The Court accordingly exercises its discretion to determine that the defenses are not waived.

[5] Plaintiff does not allege general jurisdiction over Defendants and thus the Court only addresses specific jurisdiction.

court's determination of personal jurisdiction is based on affidavits and other written materials, and no jurisdictional hearing is conducted, the plaintiff usually bears only a prima facie burden." *Celgard, LLC v. SK Innovation Co., Ltd.*, 792 F.3d 1373, 1378 (Fed. Cir. 2015) (citation omitted). In contrast a "preponderance of the evidence" standard applies "where the parties conduct jurisdictional discovery but no jurisdictional hearing was necessary because the parties indicated to the district court that the jurisdictional facts were not in dispute." *Id.* (citing *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001)). In cases such as this, where "jurisdictional discovery was conducted and the district court did not conduct a jurisdictional hearing" but jurisdictional facts remain in dispute, "the exception in *Pieczenik* does not apply." *Id.* Thus, Plaintiff need only "make a prima facie showing of jurisdiction." *Id.* "[W]here the plaintiff's factual allegations are not directly controverted, [they] are taken as true for purposes of determining jurisdiction." *Nuance Comms, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1231 (Fed. Cir. 2010) (citation and internal quotation marks omitted).

## B. Analysis

### i. New York Long-Arm Statute

While Federal Circuit caselaw governs the federal due process analysis, "in interpreting the meaning of state long-arm statutes, [the Federal Circuit] elect[ed] to defer to the interpretations of the relevant state and federal courts, including their determinations regarding whether or not such statutes are intended to reach to the limit of federal due process." *Graphic Controls Corp. v. Utah Med. Prods., Inc.*, 149 F.3d 1382, 1386 (Fed. Cir. 1998) (collecting cases).

"In New York, the question of long-arm personal jurisdiction over an out-of-state defendant is governed by N.Y. C.P.L.R. § 302." *Penguin Group (USA) Inc. v. Am. Buddha*, 609

F.3d 30, 35 (2d Cir. 2010). Plaintiff asserts jurisdiction under C.P.L.R. § 302(a)(3), which

provides for jurisdiction over a non-domiciliary who, in relevant part, "commits a tortious act

without the state causing injury to person or property within the state" if the individual either "(i)

derives substantial revenue from goods used or consumed . . . in the state" or "(ii) expects or

should reasonably expect the act to have consequences in the state and derives substantial

revenue from interstate or international commerce." In this analysis, "each element is essential,

and if plaintiffs fail to proffer sufficient evidence for any element, it is dispositive of the issue of

personal jurisdiction under this provision." *Overseas Media, Inc. v. Skvortsov*, 407 F. Supp. 2d

563, 575 (S.D.N.Y. 2006) (citation and internal quotation marks omitted).

## 1. C.P.L.R. § 302(a)(3): Commission of a Tort Outside New York Causing Injury Inside New York

As a threshold matter, Plaintiff must allege that (1) Defendant committed a tortious act

outside of New York which (2) caused an injury that occurred within New York.

Plaintiff alleges that Estar committed a tortious act outside of New York by importing

products that infringe on its patent into Texas, in violation of 35 U.S.C. § 271(c). Plaintiff

further alleges that Estar directly infringes and induces others to infringe on those patent rights.

*See* Compl ¶¶ 83-96. Assuming, without deciding, that Estar's products infringe Plaintiff's

patent, then Estar's importation of the accused products constitutes a tortious act in Texas. *See*

*Stephan v. Babysport, LLC*, 499 F. Supp. 2d 279, 288 (E.D.N.Y. 2007); *Bank Brussels Lambert*

*v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 125 (2d Cir. 2002) (at this stage "plaintiff need

not actually prove that defendant committed a tort but rather need only state a colorable cause of

action").

The next question is whether that tortious act caused an injury that occurred within New

York. In patent infringement cases, "the situs of the injury is the place where the infringing sale

is made." *Rates Tech. Inc. v. Cequel Comms, LLC*, 15 F. Supp. 3d 409, 420 (S.D.N.Y. 2014) (collecting cases). As the Federal Circuit explained, "[e]conomic loss occurs to the patent holder at the place where the infringing sale is made because the patent owner loses business there." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994). Courts have clarified that "[o]ffering infringing goods, even without an actual sale in the state, is sufficient to meet this requirement." *Multiwave Sensor, Inc. v. Sunsight Instruments, LLC*, No. 16-cv-1361, 2017 WL 1498058, at *5 (S.D.N.Y. Apr. 26, 2017) (citation omitted).

It is clear that accused products were sold in New York. *See* O'Brien Decl. It is also evident that such sales harm Plaintiff as the patent holder. *See Beverly Hills Fan*, 21 F.3d at 1571. Estar alleges that it did not cause any such injury, however, "because Estar did not do anything in New York." Estar Reply at 7.

The Second Circuit and other courts in this circuit have looked to whether "the plaintiff has stated a colorable claim with respect to causation" and held that the requirement was met when the claims were "not inherently implausible" even if the plaintiff might not be able to prove them on the merits. *Bank Brussels*, 305 F.3d at 126 n.2. In a similar case, an Eastern District of New York court held that the causation requirement was met when a Texas company with no employees, agents, or place of business in New York sold an allegedly infringing product to a distributor who then sold the product in New York. *Babysport*, 499 F. Supp. 2d at 288 ("Since the allegedly infringing product was offered for sale in New York, Plaintiff would, indeed, suffer injury in New York.").

Some district courts have held that C.P.L.R. § 302(a)(3) requires the plaintiff to show both but-for and proximate causation. *See Art Leather Mfg. Co., Inc. v. Albumx Corp.*, 888 F. Supp. 565, 568 (S.D.N.Y. 1995) (defendant's sale to Illinois did not proximately cause

distributor's sale of those products to New York where distributor "was free to sell wherever it wished" and defendant "had no economic concern with where [distributor] sold the albums"); *Tri-Coastal Design Grp., Inc. v. Merestone Merch., Inc.*, No. 05-cv-10633, 2006 WL 1167864, at *4-5 (S.D.N.Y. May 3, 2006) (no causation where, as with *Art Leather*, defendant did not have contacts in New York, derived no economic benefit from distributor's resales of the products, and the distributor "was free to resell the [products] wherever it wished").

The Second Circuit has not held that a plaintiff must show that the defendant's actions were the proximate cause of the injury under C.P.L.R. § 302(a)(3). Out of an abundance of caution, the Court will address proximate causation. Here, Estar's actions were clearly a direct cause of the injury, and thus satisfy the former standard. Whether they were the proximate cause is less clear. Plaintiff's allegations are stronger than those in *Art Leather* and *Tri-Coastal* as the defendants in those cases sold products to multiple distributors and had no control in, or benefit from, the location of their re-sales. Here, in contrast, as detailed below, Estar and Eclipse had an exclusive distribution agreement. Thus each sale made by Eclipse benefited Estar. Moreover, in nearly parallel circumstances the Second Circuit in *Kernan v. Kurz-Hastings* assumed without deciding that the injury requirement was met when a foreign defendant sold products to an exclusive distributor who then sold them in New York. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240-41 (2d Cir. 1999).

Accordingly, the Court holds that at this stage Plaintiff has satisfied its burden under § 302(a)(3).

### 2. C.P.L.R. § 302(a)(3)(i): Derivation of Substantial Revenue from New York

In order to secure jurisdiction under C.P.L.R. § 302(a)(3)(i), Plaintiff must show that Estar "derives substantial revenue from goods used or consumed" in New York. "What

constitutes 'substantial revenue' under CPLR 302 . . . is not defined in the statute." *Allen v. Auto Specialities Mfg. Co.*, 45 A.D.2d 331, 334 (N.Y. 3rd Dep't 1974). Substantial revenue may be demonstrated either through "a substantial sum of money or a substantial percentage of the defendant's revenue." *Boyce v. Cycle Spectrum, Inc.*, 148 F. Supp. 3d 256, 266 (E.D.N.Y. 2015) (citing N.Y. Civ. Prac. ¶ 302.13). "No specific dollar threshold is required for the revenue to be deemed substantial." *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 242 (S.D.N.Y. 2010) (citing N.Y. Civ. Prac. ¶ 302.13).

It is clear that the accused products were used in New York. *See, e.g.*, O'Brien Decl. The questions are whether (1) *Estar* specifically derived revenue from such goods in New York and (2) any such revenue was "substantial."

First, the Court examines whether Estar benefited from Eclipse's sales of the accused products in New York. Plaintiff argues that Estar derives substantial revenue from New York because Eclipse sells products in New York on its behalf. Pl Mem at 7. For instance, in calendar year 2016, Eclipse sold 4,146 units of PRP and/or PRP kits for a total sales amount of $509,712. *See* O'Brien Decl. Estar benefited from those sales, Plaintiff contends, because each time Eclipse sold a product in New York it ordered more of that product from Estar. Pl Mem at 7. Estar asserts that only *Eclipse*, not Estar, derived revenue from New York. Def Reply at 3. Indeed, Estar disputes that it received any money from the sale of a PRP product in New York. Def Mem at 10 (citing Esteron Dep at 246:20-23). However, when asked whether Estar "ever received any money from the sale of a platelet-rich plasma product that was eventually deliverted to New York," Aaron Esteron ("Esteron"), Estar's CEO, responded that he did not know. Esteron Dep at 247:9-16.

Here, viewing uncontroverted facts in the light most favorable to Plaintiff, Plaintiff has

met its burden of alleging that Estar has received revenue from sales of Eclipse PRP in New York.

Second, the Court considers whether such revenue is substantial. As discussed *infra* note 6, the Court does not have Eclipse's total profits for 2016 (or for any year). Moreover, this Court does not know how much revenue Estar receives from Eclipse relative to its revenue from other distributors or direct sales. Accordingly, the Court cannot determine whether any profits derived from Eclipse's sales to consumers in New York are "substantial" relative to Estar's overall revenue.

However, courts also look to absolute revenues. There is little caselaw elucidating what constitutes substantial revenue in absolute terms. Courts have found that $8.79 million was "substantial" even when it constituted only a small proportion of the defendant's total revenue, *Allen v. Canadian Gen. Elec. Co. Ltd.*, 65 A.D.2d 39, 43 (N.Y. 3rd Dep't 1978) and that $514,490 of sales revenue in New York, out of a total $18,245,292 in revenue for the year in question, was sufficient. *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 213, 215-16 (N.Y. 2000).[6] Conversely, courts have determined that $9,000, totaling .05% of the defendant's total sales, *Murdock v. Arenson Intern. USA, Inc.*, 157 A.D.2d 110, 113-14 (N.Y. 1st Dep't 1990), and $358,000 over five years, constituting approximately .03% of the defendant's total sales, *Cortland Racquet Club, Inc. v. Oy Saunatec, Ltd.*, 978 F. Supp. 520, 528 (S.D.N.Y. 1997), was not sufficiently substantial.

Here, Eclipse's 2016 New York revenue falls in between the extremes in the cases cited above.[7] But even so, it is not at all clear how much *Estar* received from that revenue. On this

---

[6] In *LaMarca*, the plaintiff asserted jurisdiction under § 302(a)(3)(ii) (substantial revenue from interstate commerce), and had not raised § 302(a)(3)(i). However, the court's analysis is instructive here.
[7] Plaintiff urges this Court to draw an adverse inference that even more revenue has been generated from New York sales because Estar did not produce "annual sales (units and dollars) of the accused products in New York," as

record, the Court cannot say that Estar's income from New York was substantial.

### 3. C.P.L.R. § 302(a)(3)(ii): Reasonable Expectations of Consequences in New York and Substantial Revenue from Interstate or International Commerce

Alternatively, the Court considers whether Estar reasonably expected that its actions would have consequences in New York.[8] This test is "objective, rather than subjective." *Fantastic Graphics Inc. v. Hutchinson*, No. 09-cv-2514, 2010 WL 652987, at *4 (E.D.N.Y. Feb. 22, 2010) (citing *Kernan*, 175 F.3d at 241). "New York courts have sought to avoid conflict with federal constitutional due process limits on state court jurisdiction by applying the 'reasonable expectation' requirement in a manner consistent with United States Supreme Court precedent." *Kernan*, 175 F.3d at 241 (citation omitted). Accordingly, "New York courts have asserted that the simple likelihood or foreseeability that a defendant's product will find its way into New York does not satisfy this element, and that purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required." *Id.* (collecting cases). This means that the defendant "must have made a 'discernible effort to directly or indirectly serve the New York market.'" *Fantastic Graphics*, 2010 WL 652987, at *4 (quoting *Kernan*, 175 F.3d at 241). "[O]ccasional sales into New York, or awareness of a possibility that a product will find its way into New York, is not sufficient to satisfy this element." *Boyce*, 148 F. Supp. 3d at 266 (citing N.Y. Civ. Prac. ¶ 302.14).

---

required by this Court's order. Pl Mem at 7 n.10; *see* ECF No. 119. Estar asserts that both Estar and Eclipse have complied with all discovery requirements. *See* Def Reply at 3 n.3. A party requesting an adverse inference based on failure to produce documents must establish "(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002). Here, while the requested revenue is plainly relevant, Plaintiff has not demonstrated that Estar had control over evidence that it was required to produce or that it had a culpable state of mind. Accordingly, the Court declines to make an adverse inference.

[8] For the purposes of jurisdiction, Estar concedes that it derives substantial revenue from interstate or international commerce. Ball Decl Ex. G. Accordingly, the Court need not address that element.

Plaintiff alleges that Estar has sufficient purposeful contacts with New York based on (1) offers to sell the accused products to people in New York; (2) its exclusive distribution agreement with Eclipse; and (3) obligations arising from the fact that its products are FDA-regulated.

First, Plaintiff has adduced evidence of some attempted sales to New York-based individuals. In June 2014, an Estar employee spoke with a New York-based doctor during a conference in Las Vegas. *See* Ball Jdx. Decl Ex. P; Esteron Dep at 64:1-24; 65:6-12. The two individuals discussed the Tropocells system. Ball Jdx. Decl Ex. P. Following the meeting, the Estar employee emailed the doctor, providing a catalogue that included prices for the Tropocells system. *Id.* Esteron testified that the employee was "hoping" to sell Tropocells to the doctor. Esteron Dep at 170:10-18. In May 2017, Yuval Esteron, Aaron Esteron's son and "vice president of business and law," Esteron Dep. at 38:19-39:2, sent a follow-up email to that doctor, informing him that Estar would be at the Las Vegas conference again in 2017 to present new products and inviting the doctor to their booth. Ball Decl Ex. Q at 4. The doctor responded asking for "a price list for the products and some lab analysis data." *Id.* The doctor's email signature bears his New York address and URL containing the word "Manhattan." *Id.* Yuval Esteron responded providing lab data and price information, and noting that "a 'Door-to-Door' delivery directly to your clinic" is included in the price. *Id.* at 2. In his deposition, Esteron stated that "Door-to-Door" meant "from our factory gate to [the doctor]'s clinic door." Esteron Dep at 172:15-173:12.

In March 2017, a New York-based dermatology clinic emailed Yuval Esteron asking if Estar sold certain PRP tubes to individual providers. Ball Jdx. Decl Ex. S at 3. The email address contained an organizational name that included "NY." *Id.* Yuval Esteron responded

asking for the individual's location and other details. *Id.* The clinic responded stating it is based in New York, had "several locations," and "would like to order tubes from [Estar] directly." *Id.* at 2. Yuval Esteron replied, copying Eclipse personnel, stating that "Eclipse Aesthetics is our US distributor with respect to our unique PRP products;" "Eclipse has a significant presence all over the US;" and the copied Eclipse personnel "will be able to provide further information" about Estar's products. *Id.* Yuval Esteron also told the New York-based clinic to let him know if they require any further information. *Id.*

Then in June 2017 Yuval Esteron emailed a New York-based doctor he had met at the Las Vegas conference to promote the Tropocells PRP product. *Id.* Ex. R at 4. Yuval Esteron wrote, "I hope to find you among our satisfied customers." *Id.* The doctor responded asking for "what I need in order to get your products to my office in Manhattan." *Id.* The doctor's email signature indicated his location in Manhattan, and his listed website included "NY." *Id.* Yuval Esteron forwarded the email to Aaron Esteron the following day, stating "FYI." *Id.* at 3. He then responded to the doctor stating, "[a]s per ordering – we are able to ship the products directly to your office in Manhattan via courier." *Id.*

Estar argues that these allegations are insufficient. As an initial matter, Estar contends that the communications that occurred in 2017 are irrelevant, as they took place after the complaint was filed on November 11, 2016. Generally, "personal jurisdiction depends on the defendant's contacts with the forum state at the time the lawsuit was filed." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 52 (2d Cir. 1991). Nevertheless, the Federal Circuit has distinguished tort cases, in which "Defendant's contacts with the forum after the commission of the tort [generally have] no relation to the cause of action" from patent infringement cases, which "involve the continuous

infliction of injury upon the victim" thus making it "arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction." *Beverly Hills Fan*, 21 F.3d at 1562-63. Accordingly, this Court considers the post-complaint allegations.

Next, Estar asserts that the contacts are insufficient to trigger jurisdiction. Estar notes that it never shipped the accused products to the aforementioned doctors; it is unaware if the doctors ever purchased or used the accused products; and it has never cooperated with them. Esteorn Dep at 70:11-23; 71:5-7; 157:11-13; 167:14-19.

Here, Estar's offers to sell products to three New York-based doctors counts in favor of personal jurisdiction, even if no sales ultimately resulted. However, such isolated incidents are not enough to satisfy the long arm statute. *See In re Dental Supplies Antitrust Litigation*, No. 16-cv-696, 2017 WL 4217115, at *8 (E.D.N.Y. Sept. 20, 2017) ("[O]ccasional sales into New York . . . is not sufficient"). There must be something more.

Second, Plaintiff contends that Estar's exclusive distributorship agreement with Eclipse counts in favor of personal jurisdiction. In *Kernan v. Kurz-Hastings*, this Circuit held that the existence of an exclusive distributorship agreement with an entity that distributes the products at issue in the forum state, combined with "general knowledge" that the distributor would resell the relevant products throughout the United States, satisfies the reasonable expectation requirement. *Kernan*, 175 F.3d at 242. The *Kernan* Court considered "the exchange of information relevant to product development," such that the manufacturer had "potential for awareness of profitable markets." *State Farm Fire & Casualty Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 888 (S.D.N.Y. 2017).

*Kernan*'s status in light of the U.S. Supreme Court's 2011 decision in *J. McIntyre Mach.,*

*Ltd. v. Nicastro*, 564 U.S. 873 (2011), discussed *infra*, is unclear. Courts in this Circuit have determined that "[u]ntil the Second Circuit directly addresses *Kernan*, it controls this Court's analysis of jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(ii)." *Id. Kernan* does not, however, control this Court's federal due process analysis. Thus New York's long arm statute "may be broader than the confines of due process." *Id.*; *see also Tanner v. Health Graphics LLC*, No. 15-cv-0098, 2017 WL 922013, at *7 (N.D.N.Y. Mar. 8, 2017) (if item was sold under exclusive distributorship agreement with entity that distributed across the United States, including in New York, "long-arm jurisdiction under N.Y. C.P.L.R. 302(a)(3)(ii) would be proper because of *Kernan*, but the assertion of jurisdiction on that ground would violate due process due to *McIntyre* absent additional information about other New York-related contacts on [defendant's] part")[9]; *Bacon v. Fabio Perini S.p.A.*, No. 16-cv-1218, 2017 WL 4861489, at *9-10 (N.D.N.Y. July 7, 2017) (discussing application of *Kernan* post-*McIntyre*).

Estar argues that, to the extent that *Kernan* is still good law, its facts are distinguishable. Unlike in *Kernan*, the Estar-Eclipse sales agreement does not "provide[] for the exchange of information relevant to product information" or "pricing information." Estar Reply at 5. Estar emphasizes that it has not communicated with any other doctors in New York beyond the individuals mentioned above (Esteron Dep at 91:6-10); does not have New York customers (*id.* at 48:21-23) or know whether anyone in New York uses the accused products (*id.* at 51:20-23; 54:15-55:6); it does not know whether the products are sold in New York; it is not aware of where Eclipse ships its products after they arrive at Eclipse's warehouse in Texas (*id.* at 121:8-18); it is not aware of any complaints or other communications from users in New York (*id.* at

---

[9] The Court notes, however, that the plaintiff's allegations in *Tanner* were weaker than those at issue here. For example, in *Tanner* it was unclear whether the product at issue was distributed through the exclusive distributorship agreement or through a separate distributor, and there was only one documented sale to New York. *See Tanner*, 2017 WL 92013, at *7.

15

138:18-20); it has never replaced faulty goods for a New York doctor or clinic (*id.* at 139:6-8); it has never received sales forecasts that include New York (*id.* at 111:14-112:3); it has never partnered with, or paid anyone in New York for research (*id.* at 245:13-17); and it has never discussed New York in sales meetings (*id.* at 121:4-7).[10]

Plaintiff responds that the key criteria in *Kernan* are met here. Estar and Eclipse had an exclusive distributorship agreement, and Eclipse distributed products to New York. Plaintiff alleges that Estar had a "general awareness" that Eclipse distributes in the U.S. generally and in New York. The distribution agreement provided that each order would contain "information of the receiving party." Distribution Agreement § 3.3. Further, Aaron Esteron testified to his awareness that Eclipse could send products to New York. *See* Esteron Dep at 102:16-103:3 ("[Eclipse] can send to any state in New York [sic], New York included . . . Our agreement authorizes Eclipse to ship product across the U.S.A. – across the U.S.A. To the best of my knowledge, New York is in the U.S.A."); 108:10-12 ("Eclipse is an American company. So I presume it can sell [every product] in New York. Why wouldn't it?").

Here, the Court agrees with Plaintiff that the facts of this case closely mirror *Kernan*. While the record does not indicate that Estar and Eclipse actually exchanged information relevant to product development or pricing, as in *Kernan*, other factors make Estar's New York ties even stronger than in *Kernan*. As discussed above, Estar actually had contacts with three New York-based doctors. Further, *Kernan* contemplated only one sale in New York, whereas here thousands of units were sold in New York in one year alone. Thus to the extent that *Kernan* remains good law, Plaintiff has satisfied the reasonable foreseeability requirement under

---

[10] Plaintiff urges this Court to give "little (if any) evidentiary weight" to Aaron Esteron's affidavit. Pl Mem at 14-16. The Court has carefully considered the credibility of Esteron's affidavit in light of the other evidence adduced in this case by both parties.

C.P.L.R. § 302(a)(3)(ii).[11]

Jurisdiction is only proper, however, if it also satisfies due process.

### ii. Due Process

"Federal Circuit law applies to our federal due process inquiry." *Hildebrand v. Steck*

*Mfg. Co., Inc.*, 279 F.3d 1351, 1355 (Fed. Cir. 2002) (citing *Beverly Hills Fan*, 21 F.3d at 1564-

65). In order for jurisdiction to comport with due process, the defendant must "have sufficient

'minimum contacts' with the forum state, 'such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice.'" *Polar Electro Oy v. Suunto Oy*, 829 F.3d

1343, 1348 (Fed. Cir. 2016) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The Federal Circuit "appl[ies] a three-prong test to determine whether specific jurisdiction exists:

(1) whether the defendant purposefully directed activities at residents of the forum; (2) whether

the claim arises out of or relates to those activities; and (3) whether assertion of personal

jurisdiction is reasonable and fair." *Id.* The first two prongs correspond to the "minimum

contacts" analysis, while the latter corresponds to the "fair play and substantial justice" analysis.

*Id.* (internal citations omitted).

The plaintiff "bears the burden of establishing minimum contacts." *Id.* (citation omitted).

Then, upon such a showing, "the burden shifts to the defendant to prove that the exercise of

jurisdiction would be unreasonable." *Id.* (citation omitted).

### 1. Minimum Contacts

The minimum contacts prong is centered on whether "the defendant's suit-related conduct

. . . create[s] a substantial connection with the forum State." *Acorda Therapeutics Inc. v. Mylan*

---

[11] Plaintiff also argues that the reasonableness expectation is met because the accused products are medical products that can harm citizens, and Estar's contact information is on each product. The Court does not consider these arguments particularly compelling to show its awareness of or desire to sell products in New York.

*Pharm. Inc.*, 817 F.3d 755, 759 (Fed. Cir. 2016) (quoting *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)). "In order for there to be minimum contacts, 'it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum[ ], thus invoking the benefits and protections of its laws." *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1296-97 (Fed. Cir. 2009) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *accord Beverly Hills Fan*, 21 F.3d at 1565 (the "minimum contacts must be 'purposeful' contacts"). This requirement "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Beverly Hills Fan*, 21 F.3d at 1565 (citations omitted).

Specific jurisdiction can be established through a "stream of commerce" theory. However, currently "the precise requirements" of that theory are "unsettled." *Celgard*, 792 F.3d at 1381. In *Asahi Metal Industry Co. v. Superior Court of California*, "the Supreme Court was evenly divided over whether the mere awareness of a nonresident defendant that its products would foreseeably reach the forum state in the stream of commerce constitutes minimum contacts with the forum." *Polar*, 829 F.3d at 1348 (citing *Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102 (1987)).

The Supreme Court revisited this question in 2011 in *J. McIntyre Mach., Ltd. v. Nicastro*, but again did not announce a majority opinion. Justice Kennedy asserted that a defendant's "predict[ion] that its goods will reach the forum state" is insufficient to establish minimum contacts; the defendant must be "said to have targeted the forum." *McIntyre*, 564 U.S. at 882. Concurring, Justice Breyer concluded that the outcome was "determined by our precedents," and "[n]one of our precedents finds that a single isolated sale" satisfies minimum contacts. *Id.* at 888 (Breyer, J. concurring). Justice Breyer emphasized that the facts presented revealed no "'regular

. . . flow' or 'regular course' of sales" in the forum state and that there was "no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." *Id.* at 889 (Breyer, J. concurring). As the narrowest opinion, Justice Breyer's holding—"that the law remains the same after *McIntyre*"—controls. *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

Meanwhile, the Federal Circuit, whose analysis controls patent law cases such as this, thus far has "decline[d] to decide which version of the stream-of-commerce theory should apply." *Polar*, 829 F.3d at 1350.

Here, Plaintiff alleges that Estar has minimum contacts with New York under either version of the *Asahi* stream-of-commerce analysis.[12] First, Plaintiff contends that Estar has "continuously and deliberately" exploited the New York market because Estar hired Eclipse, and Eclipse has hired New York sales agents to make sales in New York, generating thousands of sales and hundreds of thousands of dollars in revenue in 2016 alone. Pl Mem at 18-19.

The number of New York sales at issue here places this matter on separate footing from *McIntyre*, which addressed only one to four sales in the forum state. *McIntyre*, 564 U.S. at 878. However, Estar avers that it did not design the product specifically for the New York market, does not advertise in New York, and does not continuously or deliberately exploit the New York market. Def Reply at 8. Further, *Eclipse's* New York sales are insufficient to attribute purposeful availment to *Estar*. The Supreme Court has made clear that "the 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State' because it is essential that the *defendant* take actions purposefully availing him or her of the privileges and benefits of the forum state."

---

[12] It appears undisputed that Plaintiff's claim arises out of Estar's activities. Accordingly, the Court centers its analysis on whether Estar purposefully directed those activities at New York residents.

*Celgard*, 792 F.3d at 1380 (quoting *Hanson*, 357 U.S. at 253-54) (emphasis in original); *see*

*Babysport*, 499 F. Supp. 2d at 290 (contacts "too tenuous" where foreign defendant's distributor

"ma[de] the independent decision to re-sell the product in New York" given that "the products

could have be[en] available for ultimate sale in any one of the states in which [distributor] does

business").

Second, Plaintiff highlights Estar's emails with three doctors based in New York.

However, as discussed above, such isolated offers for sale are, without more, insufficient. *See*

*also NexLearn, LLC v. Allen Interactions, Inc.*, 859 F.3d 1371, 1380 (Fed. Cir. 2017) (single

email offering a sale "is insufficient to establish minimum contacts").

Third, Plaintiff argues that various aspects of Estar's contractual relationship with Eclipse

demonstrate "channels for providing regular advice to customers in the forum state." This

includes channels to resolve customer complaints due to its obligations as an FDA manufacturer.

*See* Distribution Agreement §§ 7.1; 8.1; 12.10; 12.11; 13.2. However, Plaintiff has not adduced

any allegations connecting these contractual provisions to Estar's knowledge of sales in New

York or efforts to target customers there. And Estar explicitly denies any such knowledge or

efforts. *See* Def Reply at 8.

Accordingly, Plaintiff has not met its burden of showing that Estar has minimum contacts

with New York under a federal due process analysis.

Resultantly, the Court need not determine "whether the exercise of specific personal

jurisdiction over a defendant would be reasonable and fair." *M-I Drilling Fluids UK Ltd. v.*

*Dynamic Air Ltda.*, 890 F.3d 995, 1002 (Fed. Cir. 2018). However, as discussed *infra* Section

I(B)(3), the Court determines that, were minimum contacts satisfied, the exercise of personal

jurisdiction against Estar would be reasonable and fair.

### iii. Federal Long-Arm Statute

Finally, the Court considers whether personal jurisdiction is proper under the federal long-arm statute. As an initial matter, Estar contends that this claim is improper as Plaintiff did not raise it until its opposition brief. However, "the Second Circuit has made it abundantly clear that a district court has discretion to consider a belatedly-raised argument." *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017). Moreover, Estar had an opportunity to, and indeed did, address Plaintiff's arguments in it reply brief. *See Kelly v. Pearce*, 178 F. Supp. 3d 172, 180 n.6 (S.D.N.Y. 2016) (considering belatedly-raised claim where "defendants have had an opportunity to respond to the new arguments brought by plaintiff"). Accordingly, the Court considers this claim.

Under the federal long-arm statute, personal jurisdiction for federal law claims is proper if (1) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and (2) "exercising jurisdiction is consistent with the United States constitution and laws." Fed. R. Civ. P. 4(k)(2). Thus, three requirements must be met: "(1) the claim against the defendant must arise under federal law; (2) the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction; and (3) the federal court's exercise of personal jurisdiction must comport with due process." *Synthes*, 563 F.3d at 1291 (citation omitted).

First, the patent infringement claims clearly arise under federal law. *See id.*

### 1. Due Process

Second, the exercise of personal jurisdiction comports with due process. The due process analysis under Rule 4(k)(2) "contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits." *Id.* at 1295. Whether or not Estar had purposeful contacts with *New York*, it certainly purposefully sought out the *United States* market:

Estar imported its allegedly infringing products to Texas, and had an exclusive U.S. distribution agreement with Eclipse. Thus, Plaintiff has satisfied the minimum contacts prong.

Moreover, exercise of personal jurisdiction over Estar would be reasonable and fair. The burden of showing that exercising personal jurisdiction would be unreasonable is on the defendant, and where minimum contacts have been satisfied the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1355 (Fed. Cir. 2017) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The Federal Circuit has explained that "these compelling cases 'are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.'" *Patent Rights Prot. Group, LLC v. Video Gaming Tech., Inc.*, 603 F.3d 1364, 1369 (Fed. Cir. 2010) (citing *Beverly Hills Fan*, 21 F.3d at 1568).

In this process, the Court considers "five due process factors: (1) the burden on the defendant; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the states in furthering fundamental substantive social policies." *M-I Drilling Fluids*, 890 F.3d at 1002 (citing *Burger King*, 471 U.S. at 477).

Here, Estar has failed to show that jurisdiction is unreasonable. First, litigating in New York would not be particularly burdensome for Estar "'[b]ecause modern transportation and communications have made it much less burdensome for a party sued to defend [itself]' outside its home state." *Patent Rights Prot. Group*, 603 F.3d at 1370 (quoting *Burger King*, 471 U.S. at

474).  Second, New York has a strong interest in protecting its residents from patent infringement.  *See Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d, 1344, 1352 (Fed. Cir. 2003). Third, Plaintiff has a clear interest in protecting itself from patent infringement.  *See id.*  Fourth, adjudicating this action in New York would promote the interstate judicial system's interest in efficient resolution of controversies because New York spares other states "the burden of providing a forum" for Plaintiff and satisfies Plaintiff's "interest in obtaining convenient and effective relief" as Plaintiff "might otherwise face the substantial burden" of pursuing separate litigation against Estar.  *Patent Rights Prot. Group*, 603 F.3d at 1371.  Finally, "[b]ecause patent infringement is a matter of federal law, 'the shared interest of the several States in furthering fundamental substantive social policies' is not implicated by this action."  *Id.* (citing *Elecs. For Imaging*, 340 F.3d at 1352).

The remaining issue is whether Estar may be subject to personal jurisdiction of any state. The circuits are divided as to who bears the burden of showing that no other state has personal jurisdiction over the defendant.  *See Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-cv-42, 2011 WL 7053807, at *44 n.33 (E.D.N.Y. Jan. 4, 2011) (collecting cases).  The parties did not brief the issue of which circuit's law governs this analysis.

Estar relies on regional cases.  While acknowledging that the Second Circuit has yet to reach this issue, Estar states that courts in this Circuit have followed the burden-shifting rule adopted by the First Circuit.  *See id.*  Under that framework, the plaintiff bears the burden of making out a prima facie case, including "a certification that 'based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state.'"  *Id.* (quoting *U.S. v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 41 (1st Cir. 1999)).  If the plaintiff makes its prima facie case, "the burden then shifts to the

defendant to produce evidence that it is subject to jurisdiction in one or more states or that its contacts with the United States generally are insufficient." *Id.* (citing *Swiss Am. Bank*, 191 F.3d at 41).

Plaintiff contends that Federal Circuit law applies. The Federal Circuit has "adopted a burden-shifting mechanism so that 'if the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294 (Fed. Cir. 2012) (citing *Touchcom, Inc. v. Bereskin & Par*, 574 F.3d 1403, 1415 (Fed. Cir. 2009)). In so holding, the Federal Circuit explicitly rejected the First Circuit's rationale on which courts in this District have relied. It reasoned that such a standard would "allow[] some defendants to escape jurisdiction due to the excessive burden involved in making [the prima facie] showing" since "[i]t is difficult to prove a negative," and moreover the standard "would not allow plaintiffs to plead jurisdiction in the alternative" under Rule 4(k). *Touchcom*, 574 F.3d at 1415. The Federal Circuit applies this rule, as opposed to the various regional standards, to federal patent infringement cases such as this. *See Merial*, 681 F.3d at 1294 (applying Federal Circuit standard in case arising out of Middle District of Georgia).

Accordingly, this Court will apply the Federal Circuit's standard. Here, Estar has not provided an alternative court in which it is amenable to personal jurisdiction. However, the parties did not fully brief this issue. It appears possible that Estar is subject to personal jurisdiction in Texas. Plaintiff provided a letter to defense counsel stating that "Estar has still not indicated whether it would be amenable to transfer to Texas" and requesting Estar's position on the issue by December 12th. Ball Jdx. Decl Ex. C. Plaintiff avers that Estar never provided an answer. Pl Mem at 23.

Since this issue has not been fully briefed, the Court hereby orders that Estar shall submit a declaration identifying a court or courts, if any, in the United States "where jurisdiction would have been proper at the time of filing, regardless of consent." *See Merial*, 681 F.3d at 1294. If Estar does not identify any court where it is subject to personal jurisdiction, this Court will consider the application of the federal-long arm statute.

## II. Venue

### A. Legal Standard

"Whether venue is proper under § 1400(b) is an issue unique to patent law and is governed by Federal Circuit law," as is the question of "the placement of the burden of persuasion on the propriety of venue." *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1012 (Fed. Cir. 2018). The Federal Circuit recently announced that, "upon motion by the Defendant challenging venue in a patent case, the Plaintiff bears the burden of establishing proper venue." *Id.*

In a patent infringement case, venue is proper "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). It is undisputed that Defendants do not "reside" in New York for venue purposes as Eclipse and Healeon are incorporated in Texas and California, respectively. *See* ECF No. 102 at 3-4. The question here, thus, is whether Eclipse and Healeon have a "regular and established place of business" in this district.[13]

Little caselaw exists to guide this inquiry. "[F]or nearly the last 30 years, venue in patent infringement cases has largely turned on whether a defendant 'resides' in the district in question." *In re Cray Inc.*, 871 F.3d 1355, 1359 (Fed. Cir. 2017). In light of the Supreme Court's recent decision in *TC Heartland LLC v. Kraft Foods Groups Brands LLC*, 137 S. Ct.

---

[13] It is undisputed that alleged acts of infringement occurred in this district.

1514 (2017), which narrowed the scope of the "resides" prong, "litigants and courts are raising with increased frequency the question of where a defendant has a 'regular and established place of business.'" *Id.* (collecting cases).

Thus in 2017, the Federal Circuit announced a three-part test for analyzing the "regular and established place of business" prong: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant." *Id.* at 1360. Each requirement must be met. *Id.*

In this analysis, courts should be "mindful that patent venue is narrower than general venue—and intentionally so." *Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*, No. 17-cv-1725, 2018 WL 1478047, at *2 (S.D.N.Y. Mar. 26, 2018) (citing *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 (1961)). Indeed, the Supreme Court "instructed that '[t]he requirement of venue [under § 1400] is specific and unambiguous; it is not one of those vague principles which, in the interests of some overriding policy, is to be given a liberal construction." *In re Cray*, 871 F.3d at 1361 (citing *Schnell*, 365 U.S. at 264).

### B. Discussion

#### i. Treatment of Healeon's Motion

Plaintiff did not directly oppose Healeon's motion to dismiss for improper venue. Instead, in a footnote Plaintiff asserts that "Healeon and Eclipse are working in concert and should be treated the same." Pl Venue Mem at 1 n.1. In a footnote, Eclipse argues that there is no basis for Plaintiff's contention and accordingly Healeon's motion should be granted as unopposed. Eclipse Reply at 2 n.5.

Eclipse and Healeon's legal arguments are nearly identical. Indeed, their briefs are essentially verbatim aside from the specific factual allegations related to each entity. Further,

Eclipse and Healeon have not adduced any factual allegations to directly contest Plaintiff's assertion that they worked in concert.

However, Plaintiff's opposition brief does not respond to any of Healeon's factual assertions regarding its operations or New York contacts. Whether or not the entities were working together, they are different companies and thus must both be subjected to individual venue analyses. *See Magnacoustics, Inc. v. Resonance Tech. Co.*, No. 97-1247, 1997 WL 592863, at *1 (Fed. Cir. Sept. 25, 1997) ("[I]n an action involving multiple defendants venue . . . requirements must be met as to each defendant.").

Thus, to the extent that Plaintiff's legal arguments apply to both entities, this Court will consider them against Healeon as well. However, Healeon's factual assertions applying that law which are not directly contested by Plaintiff will be considered unopposed.

### ii. Place in the District

The Federal Circuit clarified that to satisfy the "physical place" requirement, there must be "a physical, geographical location in the district from which the business of the defendant is carried out." *In re Cray*, 871 F.3d at 1362. The requirement "cannot be read to refer merely to a virtual space or to electronic communications from one person to another." *Id.* At the same time, the place "need not be a 'fixed physical presence in the sense of a formal office or store.'" *Id.* (quoting *In re Cordis*, 769 F.2d 733, 737 (Fed. Cir. 1985)). For instance, a defendant's use of its employees' homes to store "literature, documents and products" and "inventory that the employees then directly took to its clients" along with a "secretarial service physically located in the district to perform certain tasks" satisfied the "physical place" requirement. *Id.* (citing *In re Cordis*, 769 F.2d at 735).

*Eclipse*

Here, Eclipse argues it has "no real property, warehouses, storage facilities, office spaces, post boxes, showrooms, leased property, or rental property within the State of New York." Supplemental Declaration of Thomas O'Brien ¶ 5 ("Supp O'Brien Decl").

Plaintiff does not contest this point, but contends that the "physical place" requirement is satisfied through the home offices of certain Eclipse employees. All Eclipse employees work out of their homes. *Id.* ¶ 9. Currently, one employee lives and works out of a home office in New York. *Id.* ¶ 6. The employee's sales territory covers New York and New Jersey. *Id.* The employee has a registered New York telephone number. *Id.* Since this litigation started, one additional Eclipse employee lived and worked out of a home office in New York for a period of time. *Id.* ¶ 7. The employee lived in New York, and the employee's sales territory covered New York and Pennsylvania. *Id.* ¶ 8. The employee had a Pennsylvania phone number. *Id.*[14] That employee left Eclipse in September 2017. *Id.* ¶ 11.

The Court determines that Eclipse employees' home offices in New York constitute a "physical place" of business in this state. Indeed, as all Eclipse employees work from home, home offices constitute a primary physical location for Eclipse's business. *See In re Cray*, 871 F.3d at 1363 n.1 (noting that "a defendant [may have] a business model whereby many employees' homes are used by the business as a place of business of the defendant.").

*Healeon*

Healeon alleges that it has "no real property, warehouses, storage facilities, office spaces, showrooms, or leased or rental property within the state of New York," and does not maintain

---

[14] Additionally, a second employee lived in New Jersey, and that employee's territory was New Jersey with "limited sales calls into New York." *Id.* ¶ 9. The employee had a New Jersey phone number. *Id.* A third employee lived in New Jersey and "had operational oversight for the sales being made in New York, as well as the rest of the North Eastern United States." *Id.* ¶ 10. That employee has a New Jersey phone number. *Id.* These employees also left Eclipse in September 2017. *Id.* ¶ 11.

"product inventory or sales product literature in New York" or a "telephone directory listing or telephone number within the State of New York. Supplemental Declaration of John Panik ¶¶ 5-7 ("Panik Supp Decl"). Unlike Eclipse, no Healeon employee, independent contractor, or agent resides in New York. *Id.* ¶ 8.

Given that there are no factual allegations that Healeon has any physical place of business in New York, this requirement is not met as to Healeon.

### iii. Regular and Established Place of Business

Next, the Court must determine whether that place is a regular and established place of business. A place of business is "a location where, for example, products are made, customers are served, or business decisions are made." *Peerless*, 2018 WL 1478047, at *4. A business may be "regular" if it, for instance, "operates in a steady[,] uniform[,] orderly [, and] methodical manner." *In re Cray*, 871 F.3d at 1362 (internal quotation marks and citation omitted). Mere "sporadic activity cannot create venue." *Id.* To be "established" the "place in question must be 'settle[d] certainly, or fix[ed] permanently." *Id.* at 1363 (quoting *Establish*, Black's Law Dictionary (1st ed. 1891)). For instance, establishing a location "for a particular transaction" does not constitute permanency. *Id.* (citing *Phillips v. Baker*, 121 F.2d 752, 756 (9th Cir. 1941)). The court clarified that "while a business can certainly move its location, it must for a meaningful time period be stable, established." *Id.* Thus "if an employee can move his or her home out of the district at his or her own instigation, without the approval of the defendant, that would cut against the employee's home being considered a place of business of the defendant." *Id.*

***Eclipse***

Here, Eclipse argues that the presence of one New York employee cannot constitute a

regular and established place of business. However, as Plaintiff demonstrates, Eclipse's New York employee's home office is not merely a "sporadic" or isolated work environment.

The employee conducts "business" out of the New York home office. As Eclipse describes, sales representatives "contact[] a prospective customer at a potential customer's office" and "take initial sales orders." O'Brien Decl ¶ 17. Once Eclipse ships the products from its office in Texas, the representative "conduct[s] an initial demonstration session at the customer's location." *Id.* ¶ 19. The fact that other business, such as shipping, payment and processing, follow-on orders, and addressing customer feedback, is handled out of Texas (*see id.* ¶¶ 17-18, 21) does not negate the business that is occurring at home offices in New York.

Moreover, such business is regular and established. Eclipse's employees have not merely worked out of New York offices by happenstance. *Cf. Sharp Corp. v. Hisense Elec. Co. Ltd.*, No. 17-cv-5404, 2017 WL 9325873, at *1 (S.D.N.Y. Decl 22, 2017) (business not "regular and established" when one employee resided in New York against wishes of employer and without conducting any business from New York home). Although Eclipse does not require sales people to live in their assigned territory, Eclipse admits that it "tries to hire people living within their assigned sales territory," one of which is New York. O'Brien Decl ¶ 12. Indeed, Eclipse's job postings reveal that it seeks out territory managers for specific locations. *See Ball Venue Decl* Exs. B, C. Those job postings list requirements that necessitate working within that sales territory. For instance, a regional territory manager in the Rochester, New York area must "[i]dentify and qualify prospective customers, demonstrate company products and establish new business" and "develop and maintain local luminaries, workshops and training centers." *Id.* Ex. C; *see also id.* Ex. F (advertising training in New York). And as discussed *supra*, sales agents must contact potential customers at their offices and conduct trainings when the Eclipse products

arrive. All of these tasks necessitate proximity to customers.

**_Healeon_**

Regardless of whether Healeon had a place of business in New York, the Court lacks sufficient information to determine whether business in New York is regular and established. Healeon employs a regional manager in Pennsylvania that occasionally visits accounts in New York or calls or emails accounts in New York for the purposes of selling Healeon products. Panik Supp Decl ¶ 9. This employee is active in New York, providing "technical support by phone or email" and "on occasion, performing product demonstrations and distributing product literature to accounts in New York." *Id.* ¶ 11. Additionally, the employee maintains product inventory and takes products with him while visiting accounts in New York. *Id.* ¶ 14. However, as with Eclipse, Healeon does not hire or maintain any phone, messaging, or secretarial services in New York or "conduct any billing or processing of sales in New York." *Id.* ¶¶ 18-19. From this record, the Court cannot determine whether Healeon's business in New York is regular or established. Thus Plaintiff has not met its burden.

### iv. Place of the Defendant

Crucially, the regular and established place of business must be "of the defendant." *In re Cray*, 871 F.3d at 1363. The fact that an employee resides or even works out of the location is insufficient since "[e]mployees change jobs." *Id.* Accordingly, "the defendant must establish or ratify the place of business." *Id.*

The Federal Circuit elucidated a number of factors to consider in this analysis, but "stress[ed] that no one fact is controlling." *Id.* at 1366. Such factors include "whether the defendant owns or leases the place, or exercises other attributes of possession or control over the place;" whether it is a "small business [which] might operate from a home;" "whether the

defendant conditioned employment on an employee's continued residence in the district;" and whether materials are stored at the place "so that they can be distributed or sold from that place." *Id.* at 1363. A court may also compare the alleged place of business with other places of business of the defendant in other venues. *Id.* at 1364.

"Marketing or advertisements also may be relevant, but only to the extent they indicate that the defendant itself holds out a place for its business." *Id.* at 1363. Such considerations include "whether the defendant lists the alleged place of business on a website, or in a telephone or other directory; or places its name on a sign associated with or on the building itself." *Id.* at 1363-64. Nevertheless, "the mere fact that a defendant has advertised that it has a place of business or has even set up an office is not sufficient; the defendant must actually engage in business from that location. In the final analysis, the court must identify a physical place, of business, of the defendant." *Id.* at 1364.

### *Eclipse*

Factors on this prong cut both ways. On the one hand, Eclipse "did not make any contributions or payments towards [employees'] workplaces," and it "does not own, lease, rent, or exercise any control over its employees' work places." O'Brien Decl ¶¶ 9-10. It also does not require employees to reside in their sales areas. *Id.* ¶ 12. Eclipse handles all customer suggestions, complaints, and other feedback or requests at its corporate office in Texas. *Id.* ¶ 21. That office also processes all sales. *Id.* ¶ 25. It does not promote any New York address or phone number. *Id.* ¶¶ 22-23. Finally, Eclipse does not provide any secretarial or other support services in New York. *Id.* ¶ 26.

Nevertheless, Eclipse does solicit sales people in public advertisements to cover the New York area and prefers that those employees live in their assigned sales area. *Id.* ¶ 12; Ball Venue

Decl Exs. B-C.  This differentiates this matter from *In re Cray*, where "no evidence show[ed] that [the defendant] believed a location within the Eastern District of Texas to be important to the business performed," or that the defendant "had any intention to maintain some place of business in that district in the event [the employees] decided to terminate their residences as a place where they conducted business."  *In re Cray*, 871 F.3d at 1365.

The fact that Eclipse reimburses all of its employees for "ordinary, reasonable, and necessary expenses" and mobile phones and vehicle use does not cut in favor of jurisdiction, as it does not appear that such reimbursements were conditioned on employees living in a certain area.  O'Brien Decl ¶ 13.

Eclipse employees' inventory counts slightly in favor of Plaintiff.  Eclipse claims that its New York employees "do not, and did not, maintain an inventory of product or literature for sale."  *Id.* ¶ 14.  While its employees do not *sell* products, they do possess Eclipse products.  The employee that currently works in New York has his own sales kit, which contains "3-4 sample PRP kits and less than fifteen copies of literature," which are used for sales demos, as well as "a small centrifuge and other accessories used for sales demonstrations."  *Id.* ¶ 15.  The previous New York employee likewise had her "own sales kit, which contained 3-4 sample PRP kits and less than fifteen copies of literature used only for sales demos," as well as "a small centrifuge and other accessories used for sales demonstrations."  *Id.* ¶ 16.

The employees did not merely possess those products—their use in New York was part of each employee's job description.  As discussed above, when Eclipse products arrive at a customer's home, the employee uses the products stored in their home office to conduct demonstrations.  This again contrasts with *In re Cray*, whose forum state-based employees did not store any inventory or conduct demonstrations in the state, or serve any customers in the

district. *In re Cray*, 871 F.3d at 1365. Likewise in a 7th Circuit case relied on by the *In re Cray* court, the forum state-based employee did not maintain any "stock in trade," "displays," or "samples" and "conducted no demonstrations of the products. *Id.* (quoting *Univ. of Ill. Found. v. Channel Master Corp.*, 382 F.3d 514, 516 (7th Cir. 1967)).

Importantly, no one factor in this analysis is determinative. Taken together, Plaintiff has met its burden of establishing that Eclipse has ratified a regular and established place of business in New York. Accordingly, the Court holds that venue as to Eclipse is proper in this district.

### *Healeon*

Plaintiff has adduced no factual allegations that Healeon has ratified any place of business in New York. Healeon "does not require any of its sales representatives or employees to reside in New York as a condition of their business relationship or employment with Healeon." Panik Supp Decl ¶ 17. Unlike Eclipse, there is no evidence that Healeon preferred that its employees resided in their sales area, or that it sought out employees to cover certain areas. Moreover, there is no evidence that any employee does or ever has worked from a place of business in New York. Thus venue as to Healeon is improper.

Plaintiff argues that, if the Court finds venue improper, this Court should sever and transfer such claims to the Eastern District of Texas. Where venue is improper, the Court may, "if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The decision to transfer under § 1406 "rests within the district court's discretion." *Katz v. Ladd Uniform Co.*, 975 F.2d 869 (Fed. Cir. 1992). Plaintiff "offers no reasons why transfer would be in the interest of justice." *See id.* Moreover, Plaintiff does not allege that its claims against *Healeon*—a California corporation—would be proper in Texas. Even if Plaintiff sought transfer to a California federal court, the record does

not reflect that transfer to California, which has no connection to the substance of this case, would be in the interest of justice. Accordingly, the claims against Healeon are dismissed.

## III.  Sealing

Finally, the Court addresses Plaintiff's motion to unseal briefing in this matter. The Court has reviewed Defendants' modified redactions. For the reasons articulated in the Court's Order of April 5, 2018 (ECF No. 155), the Court accepts Defendants' proposed modified redactions in part. The Court below identifies portions of Defendants' proposed modified redactions that the Court deems shall be made public. The parenthetical number refers to the page number on the memorandum:[15]

### A. Estar Motion to Dismiss

- "[REDACTED] and [REDACTED], and a woman identified as [REDACTED] with an email address at [REDACTED]" (3)

- "does not use the Tropocells product" (4)

- "Doctors occasionally contact Estar, mostly via email" (4)

- "aesthetic clinic" (5)

- "For each purchase order, Estar receives a statement from Eclipse, including quantity and delivery date of the goods, and a requirement that the order be shipped to Eclipse's warehouse in Texas" (5, 11)

- "While Eclipse has provided Estar with information about complaints, there were no complaints from end users in New York" (6)

- "Complaints from Eclipse" (6)

---

[15] Where the Court determined parts of a single sentence should be unredacted, for clarity it has included "[REDACTED]" in the areas that shall remain under seal. All parenthetical numbers refer to the page number on the brief.

- "There are no authorized New York distributors of Tropocells" (6)

- "No one distributes Tropocells in New York" (6)

- "Estar has never shipped Tropocells to a clinic in New York" (9)

- "While Eclipse has provided Estar with information about complaints, none were from an end user in New York" (12)

- "No complaint for Tropocells has ever originated in New York" (12)

- "There are no authorized distributors of Tropocells in New York. No person or entity distributes Tropocells in New York." (12)

### B. Opposition to Estar Motion to Dismiss

- "4,000 . . . $500,000" (1, 4, 7)

- "thousands" (5, 6, 22)

- "4,146 . . . $509,712" (7)

- "four full-time" (7)

- "Door to Door . . . unit price" (10)

- "door to door" (10)

- "[f]rom the factory gate – from our factory gate to [REDACTED]'s clinic's door" (10)

- "Estar offered to drop-ship accused products directly to [REDACTED]'s offices in Manhattan" (11)[16]

- "of Estar's access to information about New York customers" (12)

- "Section 3.3 provides" (13)

- "as possibly 'in charge of marketing on the West Coast'" (13)

- "over $500,000" (15)

---

[16] The Court notes that identifying information on page 11, footnote 14 should be redacted.

- "thousands . . . hundreds of thousands" (18)
- "4,000" (19; n.17)

### C. Estar Reply

- "Eclipse—not Estar—hires sales people in New York to sell the Eclipse PRP product. Eclipse—not Estar—has full-time sales people serving the New York market. Eclipse—not Estar—sold over 4,000 products, generating over $500,000 in revenue, in New York in 2016." (2-3)
- "these contacts did not result in product sales" (5)
- "RegenLab blatantly misrepresents the Distribution Agreement when it argues that the Agreement contradicts Mr. Esteron's affidavit because "in Section 3.7 of the distribution agreement, [REDACTED]. The language of the Distribution Agreement substituted by RegenLab with ellipsis [REDACTED] makes clear that this section refers to Eclipse's orders from Estar, not orders from Eclipse's customers and that Estar's reservation of rights has nothing to do with Eclipse's resales." (5 n.4)

### D. Eclipse Motion to Dismiss

- "Eclipse has one employee" (2)
- "sales territory covers New York and New jersey" (2)
- "two additional employees, [REDACTED] and [REDACTED], and one Regional Sales Manager, [REDACTED]" (2)
- "sales territory covered New York and Pennsylvania" (2)
- "territory was New Jersey with limited sales calls into New York" (2-3)[17]
- "also lived in New Jersey." (3)

---

[17] The Court notes that the identifying information on page 2, footnote 3 should be redacted.

- "Her title was Regional Sales Manager for the North-East Region, and she had operational oversight for sales made in New York as well as the rest of the Northeastern United States." (3)

- "[REDACTED], [REDACTED], and [REDACTED] left Eclipse in late September 2017" (3)

- "Eclipse reimburses all of its employees for ordinary, reasonable, and necessary expense incurred for the benefit of the company (e.g., cell phones, travel, parking). For mobile phones and vehicle use, Eclipse pays each employee a standard, fixed monthly stipend." (3)

- "sales kit, containing 3-4 sample PRP kits and fewer than fifteen copies of literature" (3-4)

- "also had a small centrifuge" (4)

- "[REDACTED], [REDACTED], and [REDACTED] . . . 3-4 sample PRP kits . . . fifteen copies . . . a small centrifuge" (4)

- "After first contacting a prospective customer at a potential customer's office, each Eclipse Sales Representative will take initial sales orders and transmit such documents to the Eclipse corporate officer for processing and payment. (*Id.* ¶ 17). Eclipse customers make follow-up orders and payments electronically through the Eclipse corporate website. (*Id.*) (4)

- "drop-shipped directly to the doctor's location" (4, 8)

- "the Eclipse Sales Representative will conduct an initial demonstration session at that location" (4)

- "This demonstration" (4)

- "to conduct any other form of demonstration" (4)

- "and handled by the Eclipse corporate office in Texas" (4, 8)

- "sales are billed and processed" (5)

- "one . . . employee . . . one employee" (8)

### E. Healeon Motion to Dismiss

- "in Pennsylvania" (2, 7)

- "3-4 PRP" (3)

- "has a small centrifuge" (3)

- "with 25 to 35"[18] (3)

- "from Healeon's offices in the State of California" (3, 8)

- "billing procedures and processing" (4, 8)

### F. Opposition to Eclipse Motion to Dismiss

- "4,000 . . . $500,00" (1)

- "four . . . two . . . one" (6)

### G. Eclipse Reply

- "Eclipse has agents for specific territories" (5)

- "drop-shipped directly to that doctor's location" (6)

- "the Eclipse corporate office in Texas" (6)

Accordingly for the foregoing reasons, Eclipse's motion to dismiss for improper venue is DENIED. Healeon's motion to dismiss for improper venue is GRANTED. The Court holds that Estar is not subject to personal jurisdiction in New York pursuant to the due process clause, but reserves its decision on whether personal jurisdiction is proper under the federal long-arm statute. Estar must submit a declaration by August 27, 2018 either "designat[ing] a suitable forum in which plaintiff could have brought suit" or stating that it is not subject to personal jurisdiction in any United States forum, in accordance with *Touchcom, Inc. v. Bereskin & Par,*

---

[18] The Court notes that the identifying information on page 3 in the paragraph ending with "copies of sales and product literature" should be redacted.

574 F.3d 1403, 1415 (Fed. Cir. 2009).

By August 27, 2018, the parties shall file revised versions of the aforementioned briefs,

adjusting the redactions in accordance with this Order.


**SO ORDERED.**

Dated:  August 15, 2018

       New York, New York

                                           **ANDREW L. CARTER, JR.**

                                          **United States District Judge**