<span style="color:red">**REDACTED PURSUANT TO D.I. 169**</span>

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| REGENLAB USA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 16-cv-08771 (ALC) |
| | ) | |
| v. | ) | |
| | ) | |
| ESTAR TECHNOLOGIES LTD., | ) | |
| ECLIPSE AESTHETICS LLC, | ) | |
| HEALEON MEDICAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**OPPOSITION TO DEFENDANT ESTAR TECHNOLOGIES LTD.'S MOTION
TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   THIS COURT HAS BROAD DISCRETION TO FIND PERSONAL JURISDICTION
      OVER ESTAR .................................................................................................... 2

III.  ESTAR IS SUBJECT TO PERSONAL JURISDICTION UNDER THE NEW YORK
      LONG-ARM STATUTE ....................................................................................... 4

   A.  Estar has caused harm to RegenLab in New York ........................................... 5

   B.  Estar Derives Substantial Revenue from Goods Used or Consumed in New York .......... 6

   C.  Estar expects or should reasonably expect to be sued in New York ................................. 8

       1.  Estar knows that New York customers use its products; Estar offers to ship accused
           products to New York customers directly ........................................................ 8

       2.  Estar Purposefully Contracted with Eclipse to Serve Customers in New York ........ 12

       3.  The Accused Products are FDA-Regulated and Create an Obligation Between Estar
           and its New York Customers ............................................................................. 14

       4.  Any Disputes of Fact Should be Resolve in RegenLab's Favor ................................. 14

IV.   FINDING PERSONAL JURISDICTION OVER ESTAR IN NEW YORK COMPORTS
      WITH FEDERAL DUE PROCESS ....................................................................... 16

   A.  Estar has Sufficient Minimum Contacts with New York .................................. 16

   B.  Exercising personal jurisdiction over Estar is reasonable................................. 20

V.    IF ESTAR IS NOT SUBJECT TO PERSONAL JURISDICTION UNDER THE NEW
      YORK LONG-ARM STATUTE, ESTAR IS SUBJECT TO PERSONAL
      JURISDICTION UNDER THE FEDERAL LONG-ARM STATUTE .......................... 21

## TABLE OF AUTHORITIES

**Cases**

*Altman v. Liberty Equities Corp.*,

    322 F.Supp. 377 (S.D.N.Y. 1971) ............................................. 4

*Art Leather Mfg. Co., Inc. v. ALbumx Corp.*,

    888 F. Supp. 565 (S.D.N.Y. 1995) ............................................. 6

*Asahi Metal Indus. Co. v. Superior Court of California, Solano County,*

    480 U.S. 102 (1987) .................................................................. 18

*Bev. Hills Fan Co. v. Royal Sovereign Corp.*,

    21 F.3d 1558 (Fed. Cir. 1994) ....................................... passim

*BMW of N. Am. LLC v. M/V Courage*,

    254 F. Supp. 3d 591 (S.D.N.Y. 2017) ..................................... 22

*Feathers v. McLucas*,

    15 N.Y.2d 443, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965) .................. 3, 4

*Hecklerco, LLC v. YuuZoo Corp. Ltd.,*

    252 F.Supp.3d 369 (S.D.N.Y. 2017) ....................................... 2

*In re Dental Supplies Antitrust Litig.*,

    16-CV-696-BMC-GRB, 2017 WL 4217115 (E.D.N.Y. Sep. 20, 2017) ............ 6, 12

*J. McIntyre Mach., Ltd. v. Nicastro*,

    564 U.S. 873 (2011) ............................................................ 16, 17

*Kernan v. Kurz-Hastings, Inc.*,

    175 F.3d 236 (2d Cir. 1999) ..................................... 12, 16, 17, 21

*Leroy v. Great Western United Corp.*,

    443 U.S. 173 (1979).............................................................................................. 5

*Mareno v. Rowe*,

    910 F.2d 1043 (2d Cir. 1990)............................................................................... 6

*McGraw-Hill Global Education Holdings, LLC v. Mathrani*,

    --- F.Supp.3d ----, 2017 WL 6343627 (S.D.N.Y. Dec. 12, 2017)........................... 2, 15, 16, 21

*Melissa & Doug, LLC v. LTD Commodities, LLC*,

    No. 15-CV-8085-JPO, 2016 WL 4367975 (S.D.N.Y. Aug. 15, 2016).................... 3, 16, 18, 20

*Merial Ltd. v. Cipla Ltd.*,

    681 F.3d 1283 (Fed. Cir. 2012)............................................................................ 23

*Metallizing Eng'g Co v. Metallizing Co of Am.*,

    62 F. Supp. 274, 276 (S.D.N.Y. 1945)…………………………………………………5

*Penguin Grp. (USA) Inc. v. Am. Buddha*,

    609 F.3d 30 (2d Cir. 2010).................................................................................... 4

*Polar Electro Oy v. Suunto Oy*,

    829 F.3d 1343 (Fed Cir. 2016).............................................................................. 2, 3, 17, 18, 21

*Rates Tech. Inc. v. Broadvox Holding Co., LLC*,

    No. 13-CV-0152, 2014 WL 46538 (S.D.N.Y. Jan. 6, 2014) ................................. 2

*Rates Tech., Inc. v. Cequel*,

    15 F. Supp. 3d 409 (S.D.N.Y. 2014)..................................................................... 8

*Reyes v. Sanchez–Pena*,

    191 Misc.2d 600, 742 N.Y.S.2d 513 (N.Y.Sup.Ct.2002) ..................................... 3, 4

*Safe-Strap Inc. v. RDN, Int'l*,

2002 WL 14360 (S.D.N.Y. Jan. 4, 2002) ............................................................................... 8

*State Farm Fire & Cas. Co. v. Swizz Style, Inc.*,

246 F. Supp. 3d 880 (S.D.N.Y. 2017)................................................... 14, 19, 21, 24

*Stevens v. Mad River Holdings, LLC*,

No. 01-CV-9274, 2002 WL 826959 (S.D.N.Y. 2002).............................................. 2

*Whitaker v. Am. Telecasting, Inc.*,

261 F.3d 196 (2d Cir. 2001)........................................................................................ 8

*Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co., Ltd*,

497 F.Supp.2d 388 (S.D.N.Y. 2007)......................................................................... 7

## Statutes and Rules

21 C.F.R. § 801 .................................................................................................................. 14, 19

35 U.S.C. 271 ........................................................................................................................ 5, 22

N.Y. C.P.L.R. § 302 ......................................................................................................... passim

Federal Rule of Civil Procedure 4 ..................................................................................... 22, 23

Federal Rule Civil .Procedure 37 .............................................................................................. 7

## Other Authorities

Judicial Conference Report on CPLR, 1966 McKinney's Session Laws ...................................... 3

Mem. of Judicial Conference, 1966 N.Y. Sess. Laws 2911 (McKinney)...................................... 3

## I.    INTRODUCTION

This Court should find that personal jurisdiction over Estar in New York is proper. In 2016 alone, Defendants **sold over 4,000 units** and **$500,000 of product here**. Nevertheless, Estar seeks to avoid liability in New York and continue to willfully infringe RegenLab's patent rights here, causing significant damage to RegenLab.

RegenLab has met its *prima facie* burden to establish personal jurisdiction under Federal Due Process and the New York Long-Arm Statute.[1] N.Y. C.P.L.R. § 302. Jurisdictional discovery has established that (1) Estar's products are systematically and continuously sold in New York through Estar's exclusive distributor, Eclipse, which has salespeople in New York; (2) Estar purposefully contracted with Eclipse to sell accused products in New York and "wants" Eclipse to sell Estar's products here; (3) Estar sold **over 4,000** products (**over $500,000 worth**) in New York in calendar year 2016; (4) **Estar** employees try to sell accused products to customers in New York, "hoping" to make sales here; and (5) ███████████████████████ ████████████████████████████████████████████████ These and other New York contacts establish that Estar purposefully intended to exploit and benefit from the New York market (and has).

In any event, even if the Court finds that it does not have jurisdiction under the New York Long-Arm Statute, personal jurisdiction is proper in New York pursuant to the **Federal** Long-Arm statute.

Accordingly, the Court should deny Estar's Motion to Dismiss.

---

[1] Estar's misrepresentations that RegenLab's theories have somehow shifted smacks of gamesmanship. RegenLab offered to **focus** on Section 302(a)(3) to simplify the issues in this case. (Dkt. 56 at 1.)

## II.    THIS COURT HAS BROAD DISCRETION TO FIND PERSONAL JURISDICTION OVER ESTAR

This Court should exercise its broad discretion to find personal jurisdiction over Estar. *See Stevens v. Mad River Holdings, LLC*, No. 01-CV-9274, 2002 WL 826959, at *2 (S.D.N.Y. 2002) ("A district court has broad discretion in determining whether to grant a motion to dismiss based on lack of personal jurisdiction . . . ."). At this point in the case, RegenLab need only make a *prima facie* showing. *Rates Tech. Inc. v. Broadvox Holding Co., LLC*, No. 13-CV-0152, 2014 WL 46538, at *1 (S.D.N.Y. Jan. 6, 2014) ("Where the district court's disposition as to the personal jurisdiction question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only to make a *prima facie* showing that defendants are subject to personal jurisdiction." (internal quotation marks omitted)); *Hecklerco, LLC v. YuuZoo Corp. Ltd.,* 252 F.Supp.3d 369, 374 (S.D.N.Y. 2017). "Under the prima facie standard, the court must resolve all factual disputes in plaintiff's favor." *Polar Electro Oy v. Suunto Oy*, 829 F.3d 1343, 1347-48 (Fed Cir. 2016); *McGraw-Hill Global Education Holdings, LLC v. Mathrani*, --- F.Supp.3d ----, 2017 WL 6343627, at *2 (S.D.N.Y. Dec. 12, 2017) ("A court construes the pleadings and affidavits in the light most favorable to the plaintiff and resolves all doubts in plaintiff's favor, notwithstanding any controverting presentation by the moving party.") (internal quotation marks omitted)).

RegenLab has provided more than a *prima facie* showing of this Court's jurisdiction over Estar under the New York Long-Arm statute. N.Y. C.P.L.R. § 302(a)(3). In fact, Section 302 was enacted for precisely these circumstances—where an out-of-state defendant sends its products to New York, even if indirectly, and causes damage to a New York resident. As stated by the Second Circuit:

2

> [Section 302(a)(3)] was adopted to fill a gap in the New York Long–Arm Statute that was recognized in *Feathers v. McLucas*, 15 N.Y.2d 443, 209 N.E.2d 68, 261 N.Y.S.2d 8 (1965). There, the New York Court of Appeals declined to apply section 302(a)(2), which provides for jurisdiction over any person who "commits a tortious act within the state," to a manufacturer whose negligent construction of a gas tank in Kansas had caused bodily injury in New York State. *Id.*, 15 N.Y.2d at 460, 209 N.E.2d at 77, 261 N.Y.S.2d at 21 (internal quotation marks omitted).
>
> The following year, according to a Memorandum of the New York Judicial Conference, the New York State Legislature adopted section 302(a)(3) for the purpose of "broaden[ing] New York's long-arm jurisdiction so as to include non-residents who cause tortious injury in the state by an act or omission without the state." Mem. of Judicial Conference, 1966 N.Y. Sess. Laws 2911 (McKinney) (as quoted in *Reyes v. Sanchez–Pena*, 191 Misc.2d 600, 608, 742 N.Y.S.2d 513, 520 (N.Y.Sup.Ct.2002)).

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 37–38 (2d Cir. 2010); *see also Reyes v. Sanchez–Pena*, 191 Misc.2d 600, 608, 742 N.Y.S.2d 513, 520 (N.Y. Sup. Ct. 2002) ("[T]he Judicial Conference stated, among other things, that "in view of the serious gap in the coverage afforded by CPLR 302(a)(2) the Judicial Conference believes an amendment is required . . . ." (Judicial Conference Report on CPLR, 1966 McKinney's Session Laws, at 2788).”). Like the manufacturer in *Feathers*, Estar ships products to New York through its exclusive distributor, Eclipse. Estar must be held responsible for the damages it caused here.

Estar aims to avoid consequences in New York by arguing that its significant sale of products in New York through the stream of commerce does not establish personal jurisdiction. Estar is wrong. Stream-of-commerce theories of personal jurisdiction are gaining prominence due to increasing globalization. *See, e.g., Polar Electro Oy*; *Melissa & Doug, LLC v. LTD Commodities, LLC*, No. 15-CV-8085-JPO, 2016 WL 4367975, at *4 (S.D.N.Y. Aug. 15, 2016). Indeed, bedrock stream-of-commerce principals support exercising jurisdiction: a party who places a product in the stream of commerce to serve and benefit from the New York market is subject to personal jurisdiction in New York. Here especially, Estar specifically offers to sell its

products to New York doctors, and has continuously and systematically served the New York market through both its own employees and Eclipse's New York sales agents. Estar is therefore subject to personal jurisdiction here.[2]

## III. ESTAR IS SUBJECT TO PERSONAL JURISDICTION UNDER THE NEW YORK LONG-ARM STATUTE

RegenLab has established personal jurisdiction over Estar under the New York Long-Arm Statute. N.Y. C.P.L.R. § 302. Specifically, Estar hired a U.S. distributor (Eclipse) that Estar *knew* would serve the New York market, and then shipped *over 4,000* products to New York through its distributor *in 2016 alone*, totaling sales over ***$500,000***. (*See, e.g.,* Tr.[3] at 102 l. 16 – 103 l. 3; 105 l. 19 – 106 l. 9; 107 l. 23 – 108 l. 12); (Ex. A). These activities significantly harm RegenLab and fall squarely within Section 302 of the Long-Arm statute, which provides:

> [A] court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
> …
> commits a tortious act without the state causing injury to person or property within the state, . . . if he
>
> (i)  regularly does or solicits business, or engages in any other persistent course of conduct, or *derives substantial revenue from goods used or consumed or services rendered, in the state*, or
>
> (ii)  *expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce* . . . .

---

[2] In addition, Estar has waived its Rule 12(b)(2) defense. Waiver of personal jurisdiction challenges can be implicated by litigation conduct. *See Altman v. Liberty Equities Corp*., 322 F.Supp. 377, 378 (S.D.N.Y. 1971) (discussing "waiver by implication"); *Leroy v. Great Western United Corp*., 443 U.S. 173, 180 (1979). Here, Defendants' press releases and court filings make clear that Estar is "defending" customers in New York. (Ex. D ("Eclipse *and its manufacturer, Estar Technologies, Ltd*. are currently defending the three Eclipse customers that Eclipse alleges RegenLab wrongly sued.") (emphasis added); Ex. E ("Eclipse *and manufacturer Estar Medical pledge to step-in and defend* Eclipse PRP customers sued or threatened to be sued by RegenLab . . . .") (emphasis added).) Furthermore, Estar now admits that users of Eclipse PRP in New York are its customers. (Dkt. 114 ("RegenLab has been . . . suing [Estar, Eclipse, and Healeon's] customers.").) Estar is therefore affirmatively litigating against RegenLab in New York and has waived its challenges to personal jurisdiction.

[3] Unless otherwise noted, all citations to "Tr." refer to the transcript of the Deposition of Aaron Esteron. (Ex. F.)

4

*Id.* (emphasis added). At least because Estar purposefully made ***thousands*** of sales here, Estar

derives substantial revenue from goods used or consumed in New York (satisfying subsection

(i)), and expects or should reasonably expect consequences in New York (satisfying subsection

(ii)). Furthermore, ██████████████████████████████████████

██████████████████████████████████. (*See* Ex. G.)

### A.  Estar has caused harm to RegenLab in New York

Section 302 applies to this case because Estar has committed tortious acts outside of New

York that cause injury to RegenLab in New York. Estar admits it imports the accused products

into Texas, which is a tort committed outside New York. *See* 35 U.S.C. 271(c) ("[W]hoever . . .

imports into the United States a[n] . . . apparatus for use in practicing a patented process . . . shall

be liable as a contributory infringer."); *See also Metallizing Eng'g Co v. Metallizing Co of Am*.,

62 F. Supp. 274, 276 (S.D.N.Y. 1945) ("Infringement, direct or contributory, is a tort, the

invasion of a right of the patentee.").

RegenLab has alleged that Estar induces infringement through its marketing activities.

(Dkt. 1 ¶ 84 (RegenLab has also alleged joint and several liability *id.* ¶ 85).) Estar admits that it

approves the instructions for using the accused products. (Tr. 187 l. 22 – 188 l. 7); 35 U.S.C. §

271(b). These instructions actively induce others to infringe the patent in New York, causing

further tortious acts and injury here. Estar has even indemnified its customers who are directly

infringing RegenLab's patent rights in New York. (*see* Section III, *supra*). This ***increases*** the

infringement for which Estar is responsible in New York.

Estar sells ***thousands*** of its products in New York through Eclipse for substantial profits.

(Ex A.) RegenLab alleges that doctors in New York then use these products to directly infringe

its patent. This damages RegenLab in New York because infringement occurs in New York.

RegenLab suffers further harm in New York because it loses sales and customers here. *Bev. Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994) (patent owner suffers loss "at the place where the infringing sale is made because the patent owner loses business there"); *Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co., Ltd*, 497 F.Supp.2d 388, 400 (S.D.N.Y. 2007) (same); (Dkt. ¶ 95).

The cases cited by Estar concerning this issue are inapposite. First, *Whitaker*[4] and *Mareno*[5] are not patent cases and provide no insight as to when or where a patentee is injured. *Safe-Strap*[6] and *Rates Technology*[7] are readily distinguishable because **there were no sales of infringing products in New York**. *In re Dental*[8] hardly had any more. Here, we have thousands. Finally, *Art Leather Mfg. Co., Inc. v. ALbumx Corp.*, 888 F. Supp. 565 (S.D.N.Y. 1995) is not controlling. The Federal Circuit, which has exclusive appellate jurisdiction over issues intimately related to patent law, such as personal jurisdiction over alleged infringers, has determined that injury occurs where sales occur, including sales in the forum state **downstream** the distribution chain. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558 (Fed. Cir. 1994).

### B.    Estar Derives Substantial Revenue from Goods Used or Consumed in New York

The significant sales of Estar's products in New York establish personal jurisdiction over Estar pursuant to Section 302(a)(3)(i). (*See* Dkt. 102 ("[N]o specific dollar threshold is required; the main concern is the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums.").) Eclipse hires salespeople in New

---

[4] *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001).
[5] *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990).
[6] *Safe-Strap Co, Inc. v. RDN, Int'l,* 2002 WL 14360 (S.D.N.Y. Jan. 4, 2002).
[7] *Rates Tech., Inc. v. Cequel,* 15 F. Supp. 3d 409 (S.D.N.Y. 2014).
[8] *In re Dental Supplies Antitrust Litig.,* 16-CV-696-BMC-GRB, 2017 WL 4217115 (E.D.N.Y. Sep. 20, 2017).

York specifically to make sales here on behalf of Estar. At the time the Complaint was filed, Eclipse had four full-time sales people serving the New York market. (Ex. O ¶¶ 6, 7.) These salespeople are purposefully located in or near New York to make sales here.[9]

Eclipse recently provided information relating to Eclipse's sales in New York. In calendar year 2016 alone, *4,146* products were sold here on behalf of Estar, constituting total sales of *$509,712*.[10] (Ex. A.) Yet Estar refuses to acknowledge that it benefits from these sales. (Tr. 206 l. 25 – 207 l. 8; 211 l. 21 – 212 l. 18.) This is illogical. Estar derives substantial revenue from these sales because, for example, each time Eclipse sold one of the over 4,000 products in 2016, Eclipse ordered that product from Estar. Moreover, Estar's argument that these products are Eclipse's, and not Estar's, is belied by the testimony of its CEO:

> Q.    . . . [I]f a clinic in New York purchases Eclipse PRP, is that a customer of Estar's?
> A.    Absolutely not.
> Q.    But Eclipse PRP is Estar's product?
> A.    It is a product of Estar's with a brand name of Eclipse.

Tr. 206 l. 25 – 207 l. 8. Further still, the product's own packaging clearly informs the customer that the product is Estar's and only "manufactured for" Eclipse:

---

[9] RegenLab has identified many New York users and promoters of the Eclipse PRP product, examples of which are provided in Exhibits I - M. These customers are in addition to the Defendants in a separate litigation (Goldenberg Dermatology, P.C., Trifecta Medical, Garden City Dermatology, and Raj Kanodia, M.D.).

[10] Despite this overwhelming evidence that Estar obtains substantial revenue from sales of Eclipse PRP in New York, this is only the tip of the iceberg. RegenLab notes that it asked for, and the Court ordered, *annual* sales in New York, year over year. (Dkt. 119; Ex. N.) Thus, Estar has refused to provide discovery ordered by the Court in violation of Rule 37. Accordingly, the Court should make a negative inference that Eclipse's sales in New York in 2014, 2015, and 2017 are equal to or greater than its 2016 sales. F.R.C.P. 37(b)(2)(i) ("If a party . . . fails to obey an order to provide or permit discovery  . . . the court . . . may . . . (i) designate[] facts be taken as established . . .")



Any argument that New York doctors are not Estar's "customers" is a false and manufactured defense. Accordingly, Estar derives substantial revenue from the use of its goods in New York and is subject to jurisdiction here.

### C.    Estar expects or should reasonably expect to be sued in New York

   *1.    Estar knows that New York customers use its products; Estar offers to ship accused products to New York customers directly*

Estar's purposeful activities directed to the New York market establish that Estar should expect or reasonably expect to be sued here. While Estar only produced 14 documents in response to RegenLab's document requests, 11 of the documents were related to solicitations of and offers for sale to doctors in New York. Indeed, jurisdictional discovery unearthed communications between Estar and New York doctors whereby Estar offers to sell accused products and solicit business in New York. Yet even now—after a year of litigation and suit of its customers in New York—Estar still makes the dubious claim that it does not know if the Eclipse PRP product is sold here.

In 2014, Estar attended a seminar in Las Vegas called The Orthobiologic Institute PRP &

Regenerative Medicine Symposium ("TOBI"). (Ex. P; Tr. 64 l. 24 – 65 l. 5.) There, an employee

of Estar, ██████████████, met with a New York doctor, █████████, who owns a clinic in

New York. (*Id.*; *see also* ████████████ (last accessed Jan. 3, 2018).) ████████████████

offered to sell to ████████ in a blatant attempt to serve the New York market with accused

products. (Ex. P.) She marketed Estar's Tropocells product and gave ██████████ promotional

materials. (*Id.*) She also offered to arrange a conference call with Estar's scientific director. (*Id.*;

Tr. 61 l. 7 -9.) Mr. Esteron testified that ████████████████ was "hoping" that ██████████████

would buy Estar's products:

> Q.    Was Estar hoping to sell products to ████████████ in 2014?
> A.    Yes.
> Q.    What products?
> A.    Tropocells.

(Tr. 170 l. 10 – 14.)

Since TOBI 2014, Estar has continued to solicit doctors from New York, including ████

████. Last May, Yuval Esteron[11] contacted ████████████ again and extended "a warm

invitation" to ████████████ to visit Estar's booth at TOBI 2017. (Ex. Q.) Yuval Esteron sent ████

████ more product literature and proclaimed that Estar "will be presenting [its] new

innovative PRP products and technology including [its] new 22ml PRP tube!" (*Id.*) Yuval

Esteron further requested that ████████████ contact him to "schedule a personal meeting and

discuss potential collaboration." (*Id.*) ████████████ responded by requesting a price list and lab

analysis data. (*Id.*)[12] In his reply, Yuval Esteron provided product and pricing information, and

---

[11] Yuval is the son of CEO Aaron Esteron and acts as "vice president of business and law, legal matters." (Tr. 38 l. 19 – 39 l. 2.)

[12] ████████████ email signature includes reference to his clinic in Manhattan, as does his website, ████████████████████

stated that "a 'Door to Door' delivery *directly to your clinic* is already included in the unit

price." (*Id.*)

      RegenLab questioned Estar regarding these emails during Mr. Aaron Esteron's

deposition:

> Q.    Why did Yuval decide to contact ███████ on May 23rd, 2017?
> A.    It's very simple. Yuval had the information -- contact information from ███
> on -- of ███████ from TOBI 2014. And he was hoping to meet with ███
> ███ in TOBI 2017.
>
>            …
>
> Q.    Why was he hoping to meet with ███████?
> A.    ███████ received material from ███ in 2014. As an orthopedic, who
> is going to a very specific conference or orthobiologic, we assumed he
> might be interested in our products.

(Tr. 168 l. 9 – 169 l. 15.) When asked about Estar's offer of "door to door" delivery, Mr.

Aaron Esteron confirmed that this meant "[f]rom the factory gate – from our factory gate

to ███████'s clinic's door." (Tr. 173 l. 10 – 12.)[13]

      ███████ is not the only New York doctor targeted by Estar. In June 2017, Estar

contacted another doctor in New York, ███████, whom Estar met at TOBI 2017. (Ex.

---

[13] Estar designated Aaron Esteron for Estar's 30(b)(6) deposition despite Yuval Esteron being the "Vice President of Business Development" and the Estar representative on nearly all documents produced by Estar. (*See* Exs. P, Q, R, and S.) Aaron Esteron's deposition makes clear that Yuval Esteron has more information regarding Estar's contacts with doctors. (*See, e.g.*, Tr. 163 l. 14 - 22; 110 l. 19 – 22.) For instance, Mr. Aaron Esteron could not recall when or whether Yuval Esteron had previously met with ███████:

> Q.    To clarify, did Yuval meet with ███████ at TOBI in 2014?
> A.    I cannot recall.
> Q.    Who would know?
> A.    Yuval may remember if he met with him or not.
>
>            …
>
> Q.    So in the next line, then, why does Yuval say: "As you may recall, my name is Yuval Esteron."
> A.    He may have met with him and is trying to remind him of a meeting. Only that I cannot remember
> if there was such a meeting. The only thing is I wasn't in such -- such a meeting.

(Tr. 165 l. 24 – 167 l. 7.) Aaron Esteron even changed his answer to RegenLab's questions regarding Estar's contact with a New York doctor after speaking with Yuval Esteron. (Tr. 80 l. 20 – 81 l. 11.) Thus, Aaron Esteron was either improperly designated as a witness, or unprepared.

R.) Upon ▮▮▮▮▮ request, Estar invited him to visit Estar's facilities in Israel, which occurred last July. (*Id.*) More importantly, ***Estar offered to drop-ship accused products directly to*** ▮▮▮▮▮ ***'s offices in Manhattan****. (*Id.*)

In March 2017, another New York clinic, ▮▮▮▮▮, contacted Estar about buying platelet rich plasma products through Estar's website. (*See* Ex. S.) Yuval responded by asking about the clinic's location and services. (*Id.*) The person stated that ▮▮▮▮▮ is "a dermatology based practice in New York [] currently doing PRP procedures. We have several locations and would like to order tubes from you directly."[14] (*Id.*) Yuval responded as follows:

> Dear ▮▮▮,
> Eclipse Aesthetics is our US distributor with respect to our unique PRP products. **As Eclipse has significant presence all over the US**, I have copied the relevant personnel from Eclipse who will be able to provide further information about our advanced 11 and 22ml PRP tubes.
> **Please kindly let me know should you require any further information.**

(*Id.* (emphases added).)[15]

There may be many other doctors in New York that Estar has made contact with at TOBI and other conferences.[16] Estar freely contacts doctors at US tradeshows, including doctors from New York. (Exs. P and R; *see also, e.g.,* Tr. 77 l. 2 – 8.). Its excuse for allegedly not knowing is that "most doctors do not come with business cards." (*Id.*)

---

[14] A company called ▮▮▮▮▮ operates the website ▮▮▮▮▮. (Ex. K). ▮▮▮▮▮ currently promotes Eclipse PRP and Eclipse Micropen on its website. (*Id.*)
[15] The fact that some of these New York contacts occurred after the filing of the Complaint is irrelevant. In *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, the Federal Circuit considered a declaration concerning forum-state contacts occurring after the filing of the Complaint. 21 F.3d 1558, 1562–63 (Fed. Cir. 1994). The Court explained that "the two causes of action, direct infringement and inducing infringement, both involve the continuous infliction of injury upon the victim," adding that "[i]n a case involving a continuous tort, it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant to the issue of specific jurisdiction." *Id.* at 1563. Like *Beverly Hills Fan*, the causes of action in this case – direct and indirect infringement – continuously damage RegenLab. In any event, Estar's assertion that doctors in New York are not their customers is meritless as Estar admits that users of Eclipse PRP in New York are its customers. (Dkt. 114 ("RegenLab has been . . . suing [Estar, Eclipse, and Healeon's] customers.").)
[16] Estar is a "resource partner" at TOBI 2018 and will once again likely solicit sales of New York doctors there. (Ex. T at 8.)

2.    *Estar Purposefully Contracted with Eclipse to Serve Customers in New York*

Estar's exclusive distribution agreement with Eclipse establishes personal jurisdiction in New York. *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236 (2d Cir. 1999). In *Kernan*, the Court found Section 302(a)(3)(ii) was satisfied by an exclusive distribution agreement coupled with "general knowledge" that a distributor would sell throughout the U.S. *Kernan*, 175 F.3d at 242. The Court further stated the "reasonable expectation" determination is objective rather than subjective, and the manufacturer "did indeed attempt to serve the New York market, even if it did so indirectly." *Id*. at 241-42. Estar should reasonably expect to be sued in New York because it knows Eclipse makes sales here and works with Eclipse to make those sales.[17]

Here, Estar has repeatedly admitted (and contended) that its "Exclusive Distributor Agreement" with Eclipse is exclusive and covers the entire United States. (*See, e.g.,* Tr. 102 l. 9 – 15; 106 l. 18 – 22; Dkt. 44 ¶ 24; Ex. U (exclusive distribution agreement between Eclipse and Estar).) The Distribution Agreement provides additional examples of Estar's access to information about New York customers. For instance, Section 3.1 of the distribution agreement provides:



---

[17] Though courts have recently raised questions regarding *Kernan's* applicability to Constitutional Due Process, *Kernan* remains good law as it applies to the New York Long-Arm statute. *State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d 880, 888–89 (S.D.N.Y. 2017) ("Until the Second Circuit directly addresses *Kernan*, it controls this Court's analysis of jurisdiction pursuant to N.Y. C.P.L.R. § 302(a)(ii)—which may be broader than the confines of due process—and its application easily leads to the same result with regard to New York's long-arm."). Even cases cited by Estar support the conclusion that *Kernan* remains good law concerning C.P.L.R. § 302. *See In re Dental Supplies Antitrust Litig.*, 16-CV-696-BMC-GRB, 2017 WL 4217115 (E.D.N.Y. Sep. 20, 2017).

(emphasis added). Section 3.3 provides ██████████████████████████████

████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

(emphasis added). Notably, ████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████[18]

      Aaron Esteron ***admitted*** in his deposition that he "wants" Eclipse to sell the Eclipse PRP

product in New York:

> Q.    Can doctors in New York use Tropocells for aesthetics?
> A.    I will not sell Tropocells in New York if I know it's for aesthetic purposes. Because, for aesthetic applications, ***we want only Eclipse to sell it***.

(Tr. 219 l. 12 – 17 (emphasis added).) Estar forwards product inquiries to Eclipse, including

product orders from clinics and doctors Estar ***knows*** are in New York. (Ex. S.) Estar forwards

these product inquiries because it ***knows and expects*** Eclipse to fulfill the order. (*See, e.g.,* Tr. at

102 l. 16 – 103 l. 3; 105 l. 19 – 106 l. 9; 107 l. 23 – 108 l. 12.) Estar even copies specific Eclipse

employees on the sale inquiries it forwards, presumably based on the Eclipse employee's sales

territory. (*See* Tr. 103 l. 4 – 17 (discussing Ex. S, identifying ████████████ as possibly "in

charge of marketing on the West Coast"); *see also* Dkt. 49-3 (affidavit of Thomas O'Brien (CEO

of Eclipse) identifying ████████████ as Eclipse employee responsible for

"communicat[ions] with Estar regarding products and customer inquiries"); Ex. O ¶¶ 8, 9, and

---

[18] Estar will argue that it does not carry out these contracted provisions, but that does not negate the fact that the contract provides for them.

10.) These facts establish that Estar had or should have had a reasonable expectation of consequences in New York.

        3.    *The Accused Products are FDA-Regulated and Create an Obligation Between Estar and its New York Customers*

The unique nature of the Accused Products further supports a finding of personal jurisdiction over Estar in New York. The Accused Products are medical products that can harm citizens in New York. The FDA even acknowledged that the Accused Products could harm public safety in a violation letter sent to Eclipse. (Ex. W.) This is why Estar and Eclipse had to undergo rigorous FDA registration procedures before the Accused Products could be sold (Estar's FDA attorney is in New York). (*See* FDA's Establishment Registration & Devise Listing for Estar Technologies, available at

https://www.accessdata.fda.gov/SCRIPTS/cdrh/cfdocs/cfRL/rl.cfm?rid=124736 (last accessed Jan. 5, 2018).

This is also why Eclipse **and** Estar's contact information is on each product. 21 C.F.R. § 801.1. As the manufacturer of an FDA-regulated product, Estar has an ongoing obligation to its customers, no matter who sells the product, including customers in New York. (*See, e.g.,* Ex. X (showing Manufacturer and User Facility Device Experience (MAUDE) Adverse Event Report for "ESTAR TECHNOLOGIES LTD. ECLIPSE PRP," as well as "Date of Report To Manufacturer"). Estar cannot purposefully exploit and profit from U.S. regulations and the New York market without accepting the associated legal responsibilities.

        4.    *Any Disputes of Fact Should be Resolve in RegenLab's Favor*

Aaron Esteron's affidavit contains inconsistencies and should be given little (if any) evidentiary weight. Indeed, Estar has failed to successfully rebut RegenLab's *prima facie*

showing of personal jurisdiction. At each juncture in these drawn-out proceedings, Estar has only made conclusory, self-serving, and often times *false* assertions.

For example, Mr. Esteron stated during his deposition that Estar "does not regularly conduct or solicit business in New York." (Dkt. 44 ¶ 16.) However, when RegenLab asked if Estar's 2014 contact with ████████ constituted solicitation, he said that it was not solicitation because "[w]e did not succeed in bringing the business to maturity," adding that the word "solicit" was "put there to beautify the sentence," and "doesn't have any meaning." (Tr. 209 l. 21 – 210 l. 14.) Estar and Eclipse—working through shared counsel (D. Melman)—also sought to deny RegenLab discovery of Defendants' New York sales of accused products, (*see* Dkt. 111), which revealed *over $500,000* in sales in New York in 2016. (Ex. A.) Accordingly, Mr. Esteron's affidavit is "unpersuasive, [] not only because of [its] conclusory and self-serving nature, but also because some of the averments are flatly contradicted by [Estar's] own jurisdictional discovery." *McGraw-Hill*, 2017 WL 6343627, at *5.

Defendants' Distribution Agreement, (Ex. U), also contradicts Mr. Esteron's affidavit. For example, the affidavit states "Estar has no control or input regarding where, how, or to whom the 'Eclipse PRP' product is sold by Eclipse." (Dkt. 44 ¶ 30.) But in Section 3.7 of the distribution agreement, ████████████████████████████████████████
██

In addition, it has become clear that Estar makes assertions based on a *lack* of information. For instance, Mr. Esteron testified that he has never received a complaint about Estar's products from a customer in New York. (*See, e.g.,* Tr. 138 l. 18 – 20; 142 l. 20 – 143 l. 9.) However, he says that only because *the location of the complainant is not included in the information provided by Eclipse*. (Tr. 148 l. 15 - 18.)

Pursuant to the above, the Court should reject any reliance on Aaron Esteron's affidavit. However, even if Estar's affidavit was taken as true, the affidavit does not rebut RegenLab's *prima facie* allegations. For example, the affidavit does not:

- Deny Estar's products are sold in New York (Dkt. 1 ¶ 15);
- Deny Estar's knowledge of products sold in New York (Dkt. 1 ¶ 87);
- Deny Estar markets its products in New York (Dkt. 1 ¶ 15) (Estar vaguely refers to "separate marketing efforts" in its brief, Dkt. 43 at 20);
- Deny Estar's products are used to infringe in New York (Dkt. 1 ¶¶ 87, 90);
- Deny Estar contributes to infringement (Dkt. 1 ¶ 88);
- Deny Estar induces infringement (Dkt. 1 ¶ 84).

In fact, the affidavit does not even deny Estar has indemnified others for infringement, though Estar's press releases say it has. (*See* Exs. D and E.)

## IV.    FINDING PERSONAL JURISDICTION OVER ESTAR IN NEW YORK COMPORTS WITH FEDERAL DUE PROCESS

### A.    Estar has Sufficient Minimum Contacts with New York

Personal jurisdiction over Estar in New York comports with Constitutional Due Process for the same reasons that the New York Long Arm Statute is satisfied. "In evaluating whether there are minimum contacts for purposes of the due process inquiry, courts look broadly at the totality of Defendants contacts with the forum state.'" *Melissa & Doug*, 2016 WL 4367975, at *4 (internal quotation marks omitted); *McGraw-Hill*, 2017 WL 6343627, at *2 (same).

As explained above, *Kernan* unquestionably remains good law as applied to the New York Long-Arm Statute. (*See* Section IV(C)(2), *supra*.) Recently, however, a court in this district held that *Kernan*'s due process holding conflicts with *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011), and that the due process holding is therefore overruled. *State Farm*, 246 F. Supp. 3d at 890 (finding that though *Kernan* holds that personal jurisdiction under the Long-Arm statute is warranted "where the manufacturer 'did indeed attempt to indirectly serve the New

York market,' the revised strictures of due process now require 'something more.'" (quoting *Kernan*)). However, even if *Kernan*'s due process holding is overruled, this has ***no*** bearing on whether Federal Due Process is satisfied with respect to personal jurisdiction over Estar because the "something more" is present.

*First,* Federal Circuit law controls this Court's Federal Due Process Analysis. *Beverly Hills Fan*, 21 F.3d at 1565; *Polar Electro Oy*, 829 F.3d at 1347. The Federal Circuit recently held that the law remains ***unchanged*** following the Supreme Court's decision in *J. McIntyre Machinery, Ltd. v. Nicastro*.[19] *See Polar,* 829 F.3d at 1349. There, Court stated that: "[b]ecause *McIntyre* did not produce a majority opinion, we have held that we must follow its narrowest holding, which is what can be distilled from Justice Breyer's concurrence—that the law remains the same after *McIntyre*." *Id*. In step with this holding, the Federal Circuit further held that it must apply its precedent ***unchanged*** as well. *Id* (citing *Beverly Hills Fan*). Thus, though it doesn't affect the outcome of this case, this Court should find that *Kernan's* due process analysis remains good law as Justice Breyer's concurrence in *McIntyre* did not change the law.[20]

In fact, this case is very much like the Federal Circuit's first-cited precedent, *Beverly Hills Fan*. There, a U.S. distributor imported accused products from a foreign manufacturer to sell in the US established distribution channels. *Beverly Hills Fan*, 21 F.3d at 1655. Ultimately, the record reflected that at least 52 products reached the forum. *Beverly Hills Fan*, 21 F.3d at 1564. In analyzing Federal Due Process, the Federal Circuit held that the conflicting stream-of-commerce tests of Justices Brennen and O'Connor in *Asahi Metal Indus. Co. v. Superior Court of California, Solano County*[21] were each satisfied because "defendants, acting in consort, placed

---

[19] 131 S.Ct. 2780 (2011).
[20] In any event, RegenLab notes that the record in *Kernan* only disclosed ***one sale***. *Kernan* at 239-40. Here, in contrast, we have ***over 4,000*** products sold ***in one year***. (Ex. A.)
[21] 480 U.S. 102 (1987).

the accused [product] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan*, 21 F.3d at 1566. Likewise, due process is also satisfied in this case as a result of Defendants' sales in, knowledge of, and established distribution network serving the New York market.[22]

In addition, the Court in *State Farm* identified circumstances that are present here that establish "something more" than Defendants' exclusive Distribution Agreement:

> The Court in *Daimler*—which focused on general rather than specific jurisdiction—provided a brief overview of situations where a finding of specific jurisdiction would ostensibly still comport with due process, listing forum specific connections such as: designing the product for the market in the forum State, advertising in the forum State, ***establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State***, efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, having its largest distribution of its product in the forum State, or the ***continuous and deliberate exploitation of the forum State's market***.

*Id.* at 891 (internal citations quotation marks omitted); *see also Melissa & Doug,* 2016 WL 4367975, at *4 (S.D.N.Y. Aug. 15, 2016) ("Placing products into the forum's stream of commerce bolsters specific jurisdiction." (internal citations omitted)). Indeed, "[t]he test aims to distinguish cases in which products land in the forum ***by chance*** from those in which the defendant has purposefully availed itself of the privilege of doing business in the forum." *Id.* (internal quotation marks omitted).

Estar has "continuously and deliberately" exploited the New York market, having sold ***thousands*** of products here, earning ***hundreds of thousands*** of dollars in sales ***in 2016 alone***.

---

[22] Estar will make much of the fact that, in *Polar*, the manufacturer shipped ninety-four products directly into the forum. *Polar*, 829 F.3d at 1346. But this does not ***narrow*** the holding in *Beverly Hills Fan*. In fact, *Polar* relied on *Beverly Hills Fan*. *Id.* at 1349 ("[W]e must follow our existing precedent." (citing *Beverly Hills Fan*)). Put simply, like *Beverly Hills Fan,* the Court in *Polar* also determined that the manufacturer's contacts satisfied ***both*** stream-of-commerce tests in *Asahi*. The Court should hold the same here.

(Ex. A.) Estar's customers have testified **under oath** that they have purchased and used Estar's products in New York. (Dkts. 90-9 at 22-31; 90-10.) Estar has solicited doctors from New York, "hoping" to make sales. (Ex. P.) Estar hired Eclipse **and Eclipse's New York sales agents** to make sales in New York. (Ex. O ¶¶ 8, 9, and 10.) In fact, Eclipse had an established distribution network leading to New York when it worked for RegenLab. Estar **knew** that Eclipse would and could sell products in the New York market, and even directed Eclipse to make sales there. (Ex. S.) Estar provided its contact information on each of the **4,000** products it sold in New York in 2016. (Ex. A; 21 C.F.R. § 801.1.) It actively "**wants**" Eclipse to sell in the New York market. (Tr. 219 l. 12 – 17.)

Regarding Estar's establishing of "channels for providing regular advice to customers in the forum State," **Estar approves the instructions for use**. (Tr. 187 l. 22 – 188 l. 7). ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (Ex. U § 13.2.) ████████████████████████

████████. (Ex. U § 12.10.) It has also established channels whereby it can resolve customer complaints due to its obligations as an FDA manufacturer.[23] For instance, Section 12.11 of Defendants' distribution agreement ████████████████████████████████████████

████████████████████████.[24]

Furthermore, Estar participates in product sales and customer relations. ████████████

████████████████████████████████████████████████████████████

---

[23] Estar's FDA counsel is in New York, as is its trademark counsel. (*See* Trademark Status and Document Retrieval for "Tropocells," available at http://tsdr.uspto.gov/#caseNumber=79171775&caseType=SERIAL_NO&searchType=statusSearch, last accessed Jan. 5, 2018).

[24] After repeated inquiries, RegenLab still does not know whether there are any "integrated documents" to this agreement. (*See* Ex. U § 17.6.)

████████." Section 8.1 requires ████████████████

████" Eclipse's CEO, Tom O'Brien, admits that Eclipse has an employee who is responsible

for communicating "with Estar regarding the products and customer inquiries." (Dkt. 49-3 at 37.)

Estar intends for these efforts to reach New York, and the distribution agreement evidences that

Estar directs these marketing activities.

In sum, Estar's contacts are not random, fortuitous, or attenuated. *See Melissa & Doug,*

2016 WL 4367975, at *4–5 (S.D.N.Y. Aug. 15, 2016) ("Courts have considered an expectation

of true national distribution of the products at issue to suggest an expectation that the product in

question (or other products) would enter the forum state's stream of commerce. [Defendant]

appears to concede that its products are marketed nationwide, bolstering the claim that it expects

penetration into New York markets."). Thus, Estar has sufficient minimum contacts with New

York.

### B.    Exercising personal jurisdiction over Estar is reasonable

There are five factors concerning "reasonableness" that inform this determination:

(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the
interests of the forum state in adjudicating the case; (3) the plaintiff's interest in
obtaining convenient and effective relief; (4) the interstate judicial system's interest
in obtaining the most efficient resolution of the controversy; and (5) the shared
interest of the states in furthering social substantive policies.

*State Farm Fire & Casualty Company v. Swizz Style, Inc.*, 246 F.Supp.3d 880, 893 (S.D.N.Y.

2017) (citing *Kernan*, 175 F.3d at 244)).[25] The first prong is largely disregarded in this modern

era, especially when applied to a corporation with distributors around the globe. Regarding the

second and third prongs, a New York resident continues to be damaged in New York by virtue

---

[25] It is Estar's burden to "present[] a compelling reason that the presence of some other considerations would render
jurisdiction unreasonable," but this is "rare." *Polar Electro Oy*, 829 F.3d at 1351.

infringement here. New York has a substantial interest in adjudicating Estar's infringement. *McGraw-Hill*, 2017 WL 6343627, at *6 ("Moreover, New York undoubtedly has an interest in adjudicating the claims of its resident corporate entities, particularly those that have already brought similar actions against other textbook counterfeiters in the Southern District of New York."). And, finally, there is a strong interest in New York furthering substantive policies in New York by finding jurisdiction over Estar. *See id.* ("New York has a manifest interest in providing effective means of redress for its residents. (internal quotation marks omitted)). As explained above, Estar is the manufacturer of a medical device capable of causing harm. It cannot be judgment-proof here.

Pursuant to the foregoing, Estar's allegations and statements that it is unaware of sales in New York is simply not credible. *See McGraw-Hill*, 2017 WL 6343627, at *5. Even if Estar's statements are true, due process does not mean Estar can simply ignore where its FDA-regulated products are being sold in the United States to avoid a judgment. Due process is simply a fair *process*, which Estar was provided (and submitted to) when it decided to continuously and systematically benefit from the New York market through its distribution agreement with Eclipse. Accordingly, Estar must face liability for its willful infringement of RegenLab's patent rights in New York.

## V.    IF ESTAR IS NOT SUBJECT TO PERSONAL JURISDICTION UNDER THE NEW YORK LONG-ARM STATUTE, ESTAR IS SUBJECT TO PERSONAL JURISDICTION UNDER THE FEDERAL LONG-ARM STATUTE

If it is determined that Federal Due Process is not satisfied under the New York Long Arm-Statute, this Court should find personal jurisdiction over Estar pursuant to Federal Rule of

Civil Procedure 4(k)(2),[26] commonly known as the federal long-arm statute. As stated recently in this district:

> Rule 4(k)(2) establishes personal jurisdiction where (1) the claim arises under federal law, (2) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction, and (3) exercising jurisdiction is consistent with the United States Constitution and laws. To determine whether due process permits a court to exercise personal jurisdiction over a non-resident, a court must ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction and consider whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case. That calls for an inquiry into the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test, and into whether the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there. Notably, the operative question under Rule 4(k)(2) is whether [Defendant] has sufficient affiliating contacts with the United States in general, rather than with New York in particular.

*BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 598–99 (S.D.N.Y. 2017). In addition, Federal Circuit law—which again controls here—provides that "***if the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)***." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1294 (Fed. Cir. 2012).

Here, Estar clearly has sufficient contacts with the United States. (Ex. A.) Its thousands of sales shown in the record are from ***one state***. Lest there be any doubt, Estar ██████████ ████████████████████████████████████████████████████████████████████████.

---

[26] Rule 4(k)(2) provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
>
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
>
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Here, RegenLab's claim against Estar arises under federal law, 35 U.S.C. § 271, it served Estar with a summons, (Ex. H.), Estar has refused to identify a court of general jurisdiction that has personal jurisdiction over it, and Estar's contacts with the U.S. satisfy Federal Due Process.

(Ex. G.) It attends tradeshows in the US. It has received FDA authorization to sell products here. It has applied for patents and trademarks here. Nevertheless, Estar has refused to admit it is subject to jurisdiction anywhere else in the United States. When asked recently, Estar never even provided the courtesy of a response. (Ex. C.) Accordingly, this Court should find personal jurisdiction over Estar in New York pursuant to Federal Rule of Civil Procedure 4(k)(2).

Respectfully Submitted,

Date: January 5, 2018

Stephen Ball (Bar No. SB0202)
Walter B. Welsh (Bar No. WW3451)
Michael J. Kosma (Bar No. MK1979)
Robert D. Keeler (RK1343)
Christopher J. Stankus (CS8630)
Benjamin N. Luehrs (*Admitted Pro Hac Vice*)
Whitmyer IP Group LLC
600 Summer Street
Stamford, CT 06901
sball@whipgroup.com
wwelsh@whipgroup.com
mkosma@whipgroup.com
rkeeler@whipgroup.com
cstankus@whipgroup.com
bluehrs@whipgroup.com
litigation@whipgroup.com
Phone: 203-703-0800
Fax: 203-703-0801

*Attorneys for Plaintiff*
*REGENLAB USA LLC*

24

## CERTIFICATE OF SERVICE

This is to certify that on this 5th day of January, 2018, a true and correct copy of the

foregoing Opposition To Defendant Estar Technologies Ltd.'s Motion To Dismiss For Lack of

Personal Jurisdiction, Declaration of Stephen F.W. Ball, Jr. and Exhibits A – X, were filed

electronically and served by mail on anyone unable to accept electronic filing. Notice of this

filing will be sent by e-mail to all parties by operation of the court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing. Parties may access this filing through the court's CM/ECF System.

This is to further certify that true copies of the CONFIDENTIAL versions of foregoing

were sent to all counsel of record via electronic mail.

January 5, 2018
Date

_____
Joan M. Burnett